1
2
3
4
5
6
7
8        IN THE UNITED STATES DISTRICT COURT
9        FOR THE NORTHERN DISTRICT OF CALIFORNIA
10
11   THERASENSE, INC.,                          No. C04-02123 MJJ
                                                No. C04-03327 MJJ
12            Plaintiff,                        No. C04-03732 MJJ
                                                No. C05-03117 MJJ
13       v.
14   BECTON, DICKINSON AND COMPANY,             **ORDER RE: TOPICS FOR SUMMARY
                                                JUDGMENT HEARING**
15            Defendant.
                                        /
16

17       The Court, having reviewed the parties' summary judgment materials, instructs the parties to be

18   prepared to address the following questions at the February 22, 2008 hearing:

19   1.    Is it undisputed that the potential of the counterelectrode in the accused Bayer and BD/Nova

20         products will differ depending on the glucose concentration of the sample being measured?

21         Abbott should identify any evidence in the record that creates a disputed fact as to this specific

22         point.

23   2.    Abbott argues the Court should revise its construction of "reference counterelectrode." Abbott

24         cites to relatively recent deposition testimony of Defendants' witnesses, regarding the

25         nomenclature those individuals use, or have used, to describe the counterelectrode in the accused

26         products. What evidence in the record supports or contradicts the conclusion that these

27         individuals were using nomenclature consistent with one skilled in the art during the relevant

28         time period (the mid-1980s)?

3.    Should the '745 patent's express definition of measurement zone be given further construction

by the Court to resolve the apparent disagreement between the parties' experts as to how the phrase "sized to contain only that portion of the sample that is to be interrogated" be interpreted?

4.     If so, the Court's preliminary view is that intrinsic evidence requires the measurement zone to be a preexisting space whose dimensions are not dependent upon the measurement time or variables unique to the specific sample being measured. Assuming this restriction, what construction is most consistent with the intrinsic evidence, i.e., the 745 patent's claims, specification and prosecution history?

5.     The '745 patent requires a step of "*contacting* a sample *with* an electrochemical sensor . . ." By what claim construction principles can this Court resolve whether this claim language is referring solely to the initial action of bringing the sample and the sensor together for the first time so they are touching?

6.     Assuming the Court's construction of the non-flowing limitation precludes convection within the sample chamber during measurement: What, if anything, about Dr. Bard's expert testimony create a triable issue of fact as to whether convection occurs in the accused BD/Nova strip?

7.     What evidence in the record establishes Abbott's *prima facie* case that a 40mV variation in potential during measurement in the BD/Nova strip is an "insignificant variation" in potential?

8.     Are Dr. Johnson's "hemitocrat effect" experiments, on their own, sufficient *prima facie* evidence to establish that it is more likely than not that red blood cells reach the electrode in the BD/Nova strip during measurement?

9.     Is there a disputed issue of fact as to whether Figure 10 of the Nankai patent discloses the use of two separate counterelectrodes? Figure 10 itself appears to show the pieces 5 and 5' as being in electrical contact with each other, and collectively connected to only one lead. Can two separate counterelectrodes be on the same lead?

10.    Is there any dispute of material fact on this record as to whether every element of the '890 patent claims are disclosed in the Ikeda patent? In other words, if the Court concludes on this record that it is undisputed that the Ikeda patent is prior art, does Abbott concede that the asserted '890 patent claims are anticipated and therefore invalid?

11. For purposes of establishing "prior invention", it appears to the Court that the law does not require Abbott to prove that the *original* reduction to practice occurred in the United States. Instead, if the invention was first reduced to practice outside the United States, Abbott can claim a date of invention as of the date the invention was embodied in tangible form in the United States. *See Scott v. Koyama*, 281 F.3d 1243, 1347 (Fed. Cir. 2002). Do Defendants contend otherwise, and if so, based on what authority?

12. For purposes of establishing "prior invention", what evidence put forth by Abbott in the present record meets Abbott's burden of production to show that the 1993-94 tests in the United States, and/or the 1994 clinical trials in the United States, used electrode configurations that meet all of the claim elements of the '890 claims?

13. With respect to the Gotoh patent, Defendants contend that the '745 patent, at column 43, lines 49-62, teaches there can be *no* background signal due to shuttling where the spacing of the electrodes exceeds $(D_m)t^{1/2}$. However, it appears to the Court that under the assumed values (t=30 sec, $D_m$ is between $10^{-5}$ and $10^{-6}$ cm$^2$/sec) in that passage, the diffusion distance suggested by the $(D_m)t^{1/2}$. formula is between 54 and 173 μm. Is this calculation correct? If so, why would the drafters of the '745 patent recommend "even more preferably" a spacing of 400 μm, if 200 μm would be sufficient to eliminate *all* shuttling?

14. Based on the Court's inclusion of the words "back *and* forth" in its construction of the background signal limitation construction, Defendants contend that for shuttling to occur, a single mediator molecule must make a round trip during the measurement period, *i.e.*, must travel from the electrode to the counterelectrode, and back again, during the measurement period. Is there a dispute between the parties as to whether this is an accurate scientific description of shuttling? Can background signal be created if a mediator molecule simply makes the one-way trip, but not the round trip, during the measurement period?

15. What specific evidence put forth by Abbott creates a triable issue as to whether the '225 reference *discloses* the use of a diffusable redox mediator, given the '225 reference's express mention of a diffusable redox mediator at column 9, lines 25-29? From the Court's initial review of Dr. Turner's testimony, Dr. Turner appears to simply opine that the '225 *teaches away*

1  from the use of a diffusable redox mediator.  Does Dr. Turner's testimony create a triable issue

2  of material fact?

3  16.  Do Dr. Bard's or Dr. Turner's testimony create a triable issue of fact as to whether the '225

4  reference is enabling?

5  17.  Assuming the Court finds that the '225 reference discloses the use of diffusible redox mediator,

6  discloses the non-flowing limitation fo the '745 patent, and is enabling:  Is there any

7  disagreement between the parties as to *which* '745 claims should be declared anticipated by the

8  '225 reference by this Court?

9  18.  Assuming the Heller '225 reference anticipates claim 8 of the '745 patent: Why shouldn't the

10  Court find that claim 11 is obvious in light of Dr. Weber's uncontradicted testimony that it

11  would have been obvious to combine the '225 reference with other prior art references?  Under

12  Federal Circuit precedent, must Defendants submit evidence regarding secondary considerations

13  to establish a *prima facie* case of obviousness?   Do any of the secondary factors discussed by

14  Dr. Bard have any bearing on the additional claim limitation found in dependent claim 11?

15

16  **IT IS SO ORDERED.**

17

18

19  Dated: February 19, 2008                                    _____

20                                                             MARTIN J. JENKINS
                                                               UNITED STATES DISTRICT JUDGE

21

22

23

24

25

26

27

28