1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                     FOR THE NORTHERN DISTRICT OF CALIFORNIA

10

11   THERASENSE, INC.,                      No. C04-02123 MJJ
                                            No. C04-03327 MJJ
12          Plaintiff,                      No. C04-03732 MJJ
                                            No. C05-03117 MJJ
13     v.

14   BECTON, DICKINSON AND COMPANY,         **ORDER RE: DEFENDANTS'
                                            NONINFRINGEMENT AND
15          Defendant.                      INVALIDITY SUMMARY JUDGMENT
     _____/     MOTIONS**

16

17                             **INTRODUCTION**

18
         Before the Court are five summary judgment motions brought by the Defendants (Bayer,
19
     Roche, and BD/Nova) in these related patent infringement actions.  The motions include three non-
20
     infringement motions:
21
         (1)    a motion for summary judgment of noninfringement brought by Bayer with respect to
22
                the '551 patent;
23
         (2)    a motion for partial summary judgment of noninfringement brought by Roche with
24
                respect to the '745 patent; and
25
         (3)    a motion for summary judgment of noninfringement brought by BD/Nova with
26
                respect to the '164, '551, and '745 patents.
27

28

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1    The other two motions address invalidity issues.  They are:

2         (4)    a motion for summary judgment of invalidity brought by BD/Nova with respect to the

3                '890 patent; and

4         (5)    a motion for summary judgment of invalidity  brought by all Defendants with respect

5                to the '745 patent.[1]

6    Plaintiff Abbott opposes all of the relief sought by these motions.  The motions have been

7    fully briefed by the parties, and have been the subject of extensive oral argument.[2]

8    Having carefully considered the evidence and argument submitted by the parties,[3] the Court

9    rules as set forth below.

10                              **FACTUAL BACKGROUND**

11   The four related lawsuits that gave rise to the summary judgment motions before the Court

12   concern four United States patents owned by Abbott Diabetes Care Inc. and Abbott Laboratories

13   (collectively "Abbott"): U.S. Patent Nos. 5,628,890, 5,820,551, 6,143,164, and 6,592,745.  In the

14   lawsuits, Abbott has asserted that blood-glucose test strips marketed and manufactured by the

15   Defendants infringe one or more of the Abbott patents.

16   In Case Nos. 04-2123, 04-3327, and 04-3732, Abbott contends that Defendants Becton,

17   Dickinson and Co. ("BD") and Nova Biomedical Corporation ("Nova") (collectively "BD/Nova")

18   wilfully infringe the four Abbott patents-in-suit, entitling Abbott to damages and injunctive relief.

19   BD/Nova alleges it does not infringe the Abbott patents and that the Abbott patents are invalid,

20   thereby entitling BD/Nova to declaratory judgments of non-infringement and patent invalidity.

21   _____

22       [1] Defendants Roche and Bayer field this motion.  BD/Nova has filed a joinder.

23       [2] In advance of the hearing, the Court provided a written list of questions to the parties.  All of these questions were
24   addressed by the parties during oral argument.

25       [3] Good cause appearing therefor, the Court **GRANTS** four motions filed by Abbott to supplement the summary
     judgment record after briefing was completed.  These are: (1) Abbott's January 15, 2008 motion for leave to file additional
26   exhibits in response to new arguments asserted by Defendants on their reply brief regarding invalidity of the '745 patent; (2)
     Abbott's February 15, 2008 motion for leave to file a sur-reply and additional new evidence in support of its opposition to
27   Roche's noninfringement motion regarding the '745 patent; (3) Abbott's February 15, 2008 motion for leave to file additional
     new evidence in support of its opposition to Defendants' motion for summary judgment of invalidity regarding the '745
28   patent; and (4) Abbott's February 20, 2008 motion for leave to file supplemental evidence in support of its opposition to
     Bayer's and BD/Nova's noninfringement motions regarding the '551 patent.  The Court has considered this supplemental
     evidence as part of the summary judgment record, as well as Defendants' responses and objections thereto.

United States District Court

For the Northern District of California

In Case No. 05-3117, Abbott contends that Defendants Roche Diagnostics Corporation ("Roche") and Bayer Healthcare LLC ("Bayer") wilfully infringe the '551 and '745 patents, entitling Abbott to damages and injunctive relief.  Roche and Bayer each allege that they do not infringement the Abbott patents and that the Abbott patents are invalid, thereby entitling Roche and Bayer to declaratory judgments of non-infringement and patent invalidity.

The Court has previously construed several disputed claim terms in coordinated claim construction proceedings.  In a claim construction order dated August 31, 2006, the Court construed several terms of the '890 and '164 patents.  In a claim construction order dated April 27, 2007, the Court construed several disputed terms of the '551 and '745 patents.

**LEGAL STANDARD**

**I.      Summary Judgment.**

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating the basis for the motion and identifying the portions of the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file that establish the absence of a triable issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the moving party meets this initial burden, the burden then shifts to the non-moving party to present specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).  The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment.  *Anderson*, 477 U.S. at 247-48.  An issue of fact is material if, under the substantive law of the case, resolution of the factual dispute might affect the case's outcome.  *Id.* at 248.  Factual disputes are genuine if they "properly can be resolved in favor of either party."  *Id.* at 250.  Thus, a genuine issue for trial exists if the non-movant presents evidence from which a reasonable jury, viewing the evidence in the light most favorable to that party, could resolve the material issue in its favor.  *Id.*  However, "[i]f the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Id.* at 249-50 (internal citations

omitted).

**A.    Non-Infringement.**

To determine infringement, the asserted claim must be compared to the allegedly infringing method or device. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). To establish literal infringement, every claim limitation, or claim element, must be found in the accused subject matter. *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 29, 40 (1997). Thus, establishing that the accused method or device does not satisfy one claim limitation would support a finding of noninfringement. *Id.* The patentee must prove infringement by a preponderance of the evidence. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). Under the doctrine of equivalents, a product that does not literally infringe a patent claim may still infringe if each and every limitation of the claim is literally or equivalently present in the accused device. *See Warner-Jenkinson*, 520 U.S. at 40. Whether an element of an accused product infringes under the doctrine of equivalents depends in part on whether that component performs substantially the same function as the claimed limitation in substantially the same way to achieve substantially the same result. *See Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998); *Pennwalt Corp. v. Durand-Wayland, Inc.*, 833 F.2d 931, 934-35 (Fed. Cir. 1987) (en banc). If the differences between a claim and an accused device are "insubstantial" to one with ordinary skill in the art, the product may infringe under the doctrine of equivalents. *See Ethicon*, 149 F.3d at 1315; *Sage Prods., Inc. v. Devon Indus., Inc.*, 126 F.3d 1420, 1423 (Fed. Cir. 1997). The doctrine prevents an accused infringer from avoiding infringement by changing minor details of a claimed invention while retaining its essential functionality. *See Sage*, 126 F.3d at 1424.

**B.    Invalidity.**

A patent claim is presumed valid. 35 U.S.C. § 282. The burden is on the party challenging the patent to show, by clear and convincing evidence, that the patent claim is invalid. *See Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367 (Fed. Cir. 1986); *Invitrogen Corp. v. Clontech Laboratories, Inc.*, 429 F.3d 1052, 1063 (Fed. Cir. 2005).

*///*

United States District Court
For the Northern District of California

4

United States District Court

For the Northern District of California

**ANALYSIS**

**I.     Bayer's Motion For Summary Judgment Of Noninfringement.**

Bayer seeks summary judgment of noninfringement with respect to the '551 patent for its two accused two products, the Microfill and Autodisc strips.  Plaintiffs have accused these two products of infringing claims 1-4 of the '551 patent.  Bayer contends that these products do not infringe the asserted '551 claims for two independent reasons: (1) the Bayer products do not contain a "reference electrode", and (2) the Bayer products do not contain electrodes that are in electrical contact with each other.

**A.     The "reference counterelectrode" limitation.**

All of the '551 claims asserted against Bayer cover a device that has a "reference counterelectrode."[4]  In its April 27, 2007 claim construction order, the Court construed "reference electrode" to mean:

> an electrode that (1) is used to complete an electrical circuit with the active electrode during the glucose measurement; (2) is positioned or connected in such a way that electricity can flow between the second conductor and the electrode; (3) has a known potential relative to a standard; and (4) maintains its potential with only insignificant variation during the measurement.

Bayer contends that the undisputed evidence establishes that the counterelectrodes contained in its two accused products do not have a known potential relative to a standard.

**1.     Literal infringement.**

The testimony of Bayer's expert, Dr. Stetter, is uncontradicted that the potential of the counterelectrodes in the accused Bayer products varies significantly depending on the concentration of glucose in the sample.  (Stetter Decl., ¶¶ 18-25.)   Because the purpose of the accused devices is to measure the glucose level in blood, this means that the exact potential of the counterelectrodes is not known before measurement.

In its effort to prove that the potential of the counterelectrodes is nonetheless "known . . .

---

[4] Independent claim 1 of the '551 patent contains the "reference counterelectrode" limitation.  Claims 2-4 depend from claim 1 and therefore include the limitation as well.

United States District Court

For the Northern District of California

1    relative to a standard", Bayer relies exclusively on the testimony of its expert, Jay Johnson.[5]  Dr.

2    Johnson's testimony describes experiments in which the potential of the counterelectrodes was

3    calculated based on assumptions about the real-world circumstances in which the accused products

4    would be used, and those calculations were then compared with experimentally measured potentials.

5    (Johnson Decl., ¶¶ 44-50.)  However, Abbott and Dr. Johnson do not dispute that the potential of the

6    counterelectrodes in the accused Bayer products varies depending on the glucose concentration of

7    the sample (Johnson Decl., ¶¶ 55-56), such that the potential of the counterelectrode in Bayer's

8    accused products can only be estimated within a range that corresponds to a reasonable range of

9    glucose concentrations encountered in human blood.  (Johnson Decl., ¶¶ 22-23; Bartlett Decl., Exh.

10   11 at 365:7-371:5; Opp. at 6:24-25.)   At best, Dr. Johnson's testimony establishes that the potential

11   of the Bayer counterelectrodes can be narrowed to a range through approximation and

12   experimentation, making assumptions regarding the glucose levels that the accused device would

13   commonly encounter.  Dr. Johnson's testimony, however, fails to create a triable issue of fact as to

14   whether the potential of the Bayer counterelectrodes, which he concedes varies by glucose

15   concentration and cannot be looked up in a reference work, is "known . . . relative to a standard."

16   Having a range of potentials that can be estimated through calculation and confirmed by experiment

17   does not satisfy the claim limitation as construed by the Court.

18        Indeed, Abbott and its expert concede facts that conclusively establish that there is no literal

19   infringement under the Court's construction.  Dr. Johnson admits that the counterelectrodes in the

20   Bayer accused products are psuedoreference electrodes.  (Johnson Decl., ¶¶ 37-38; *see also* Opp. at

21   2:15-16, 8:22-23, 9:15-16.)  During the claim construction phase, this Court previously rejected

22   Abbott's contention that the claim term "reference counterelectrode" was broad enough to literally

23   encompass psuedoreference electrodes.  Abbott concedes in its opposition that "[t]he Court

24   determined that the reference electrode did not include a quasireference or pseudoreference

25   electrode."  (Opp. at 14:25-15:1.)

26        Abbott's experimental tests of the Bayer accused devices, which were performed at a set

27   ─────────────────

28        [5] Abbott misstates the burden of proof in its opposition brief.  Bayer need not "prov[e] the Accused Products do not infringe."  (Opp. at 4:21.)  It is Abbott's burden to prove, by a preponderance of the evidence, that Bayer's accused devices infringe the '551 patent.

United States District Court

For the Northern District of California

1   glucose concentration, also fail to create a triable issue of fact with respect to the "reference

2   counterelectrode" claim element.  (Johnson Decl., ¶¶ 44-50.)  To the extent those tests showed that

3   the potential of Bayer's counterelectrodes varied less than a commercial blood glucose sensor with a

4   Ag/AgCl electrode, as Dr. Johnson contends, the tests are probative of the amount of variation in the

5   potential during the measurement, but not whether the potential is "known . . . . relative to a

6   standard", a separate requirement imposed by the Court's claim construction.  Such test results do

7   not refute that the potential of the Bayer counterelectrode differs significantly depending on the

8   glucose level of the sample to be tested.  Abbott's tests therefore do not establish that the potential of

9   the Bayer counterelectrode is "known . . . relative to a standard."

10         Accordingly, there can be no literal infringement of claims 1-4 of the '551 patent because

11   Bayer's accused products do not contain a "reference counterelectrode."

12              **2.        Reconsideration of the Court's claim construction.**

13         In an effort to rescue its literal infringement allegations, Abbott requests that the Court

14   reconsider its construction of the claim term "reference counterelectrode."  Abbott contends that

15   subsequent developments since the March 9, 2007 claim construction hearing, including expert

16   testing and depositions of Defendants' witnesses, provide new evidence that support a different

17   construction.

18         As a threshold matter, Bayer argues that it is procedurally improper for the Court to revisit

19   the accuracy of its construction.  Several sister courts have required a litigant to meet the Civil Local

20   Rule 7-9 standard when requesting reconsideration of a claim construction.  *See Celerity, Inc. v.*

21   *Ultra Clean Tech. Sys. & Serv.*, 2007 U.S. Dist. LEXIS 44490 at *5 (N.D. Cal. June 1, 2007);

22   *Samsung Elecs. Co. v. Quanta Computer, Inc.*, 2006 U.S. Dist. LEXIS 54538 at *3-4 (N.D. Cal. July

23   25, 2006); *Ultratech, Inc. v Tamarack Sci. Co.*, 2004 U.S. Dist. LEXIS 21393 at *4 n.1 (N.D. Cal.

24   Oct. 12, 2004).  Though Abbott cites to Federal Circuit decisions indicating that courts "may engage

25   in a rolling claim construction, in which the court revisits and alters its interpretation of the claim

26   terms as its understanding of the technology evolves", these decisions involved avowedly tentative

27

28

**United States District Court**
For the Northern District of California

constructions arrived at in the preliminary injunction context.[6]  In contrast, this Court arrived at its claim construction after full opportunity for the parties to present evidence relevant to claim construction consistent with the detailed procedures established by the Northern District's local rules.  The Court will therefore follow the lead of its sister courts and vet Abbott's request for reconsideration as if it had been brought as a motion for leave to file a motion for reconsideration under Civil Local Rule 7-9.

Against that backdrop, the Court notes that all of the allegedly "new" evidence cited by Abbott falls into the category of extrinsic evidence, which by its nature plays a very limited role in the construction of patent claims.  Although extrinsic evidence may be used by the Court to help understand a disputed claim limitation, it may not be used to vary, contradict, expand, or limit the claim language from how it is defined, even by implication, in the specification or file history.  *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584-85 (Fed. Cir. 1996).  "Indeed, where the patent documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no weight."  *Id.* at 1584.  Here, the Court reached the appropriate construction of the "reference counterelectrode" limitation based solely on the intrinsic evidence.  Under controlling Federal Circuit precedent, the extrinsic evidence now cited by Abbott would have played a very limited role, if any, in interpreting the "reference counterelectrode" claim limitation had such evidence been before the Court at the claim construction hearing.  *See id.* at 1584-85.

Moreover, for most of the newly submitted extrinsic evidence, Abbott has failed to show that "in the exercise of reasonable diligence" it could not have provided the evidence at the time of the claim construction hearing.  Civil Local Rule 7-9(b)(1).  Abbott makes no such "reasonable diligence" showing for its citations to Roche's U.S. Patent No. Re36,268, to Nova's U.S. Patent No. 6,258,229, to the December 2006 deposition of Dr. Hill, or to its own expert's tests of its own products.  The Court is not inclined to revisit its claim construction based on extrinsic evidence that Abbott, in the exercise of reasonable diligence, could have brought to the attention of the Court at the time of the claim construction hearing.

---

[6] *Jack Guttman, Inc. v. KopyKake Enters. Inc.*, 302 F.3d 1352, 1361 (Fed. Cir. 2002); *see also Sofamor Danek Group, Inc. v. DePuy-Motech, Inc.*, 74 F.3d 1216, 1221 (Fed. Cir. 1996).

United States District Court

For the Northern District of California

1    In any event, Abbott's reconsideration arguments premised on the '268 patent, the '229

2    patent, Dr. Hill's testimony, and Dr. Johnson's experiments on Abbott's test strips are unpersuasive

3    and would not warrant a different construction even if they were considered by this Court.  For

4    example, the Roche '268 patent and the Nova '299 patent, which as extrinsic evidence are of limited

5    probative value anyway, were filed later than the application of which the '551 patent is a

6    continuation, and therefore have limited value in explaining how one of ordinary skill in the art

7    would have interpreted the '551 patent disclosures at the relevant time period.

8    Likewise, the Court is not persuaded to revise its construction based on Dr. Johnson's tests

9    on Abbott's own Medisense test strips.  Abbott contends that Dr. Johnson's tests of the Ag/AgCl

10   second electrode, not protected by a salt bridge, in Abbott's own "Precision Xtra" strips establish

11   that even an Ag/AgCl reference counterelectrode would not have a known potential relative to a

12   standard.  Therefore, Abbott argues, the Court's claim construction must be wrong since it would

13   exclude even the preferred embodiment using the Ag/AgCl reference counterelectrodes disclosed in

14   the '551 patent.  As a threshold matter, Abbott fails to persuade the Court that it should afford any

15   significant weight to this extrinsic evidence, which tested the performance characteristics of a 2007

16   commercial device, for purposes of determining what a person of ordinary skill would understand

17   from the teachings of the '551 patent in the mid-1980s.  Moreover, the data that Dr. Johnson attaches

18   to his declaration (Johnson Decl., Exh. 6) does not appear to support his statement (Johnson Decl., ¶

19   18) that the potential of the Ag/AgCl second electrode  in the Abbott commercial device differed to

20   any significant degree from the known potential of a true Ag/AgCl electrode.  The data provided to

21   the Court indicates that the potential of the Ag/AgCl second electrode, during relevant measurement

22   times, remained remarkably close in potential ( between -0.01 V and 0.00 V) versus a true Ag/AgCl

23   (3M KCl) electrode.  (Johnson Decl., Exh. 6.)   The Court is not persuaded that Dr. Johnson's tests

24   on the Abbott commercial device establish that an Ag/AgCl counterelectrode, unprotected by a salt

25   bridge, would fall outside the scope of the Court's current claim construction.[7]

26

27       [7] Nor does the testimony of Dr. Johnson or Dr. Stetter establish, as Abbott contended at oral argument, that
     variations in potential due to varying chloride concentrations in blood would cause even an Ag/AgCl second electrode to have

28   an unknown potential relative to a standard.  Dr. Johnson's cursory testimony on this point indicates only that chloride
     concentration "can affect" the potential of such a second electrode (Johnson Decl. ¶ 18), but does not indicate the

United States District Court
For the Northern District of California

1        Abbott's citation to Dr. Hill's December 2006 testimony also does not warrant a change in

2   the claim construction.  Dr. Hill conceded that the potential of an Ag/AgCl electrode could drift

3   somewhat over time after enough of the AgCl had converted to Ag through a chemical reaction.

4   (Hill Depo. at 98-100, Hutcheson Decl., Exh. 8; Hill Depo. at 96-97, Hutcheson Decl., Exh. 8A.)

5   However, this testimony does not on its own suggest that an Ag/AgCl counterelectrode would fall

6   outside the scope of the Court's construction, since the construction requires that the reference

7   counterelectrode maintain its potential with insignificant variation only "during the measurement",

8   not indefinitely.  Dr. Hill also provided somewhat ambiguous testimony that equates the function of

9   a pseudoreference with the combination of a reference electrode and a counterelectrode.  (Hill Depo.

10  at 93-94, Hutcheson Decl., Exh. 8A.)  But this testimony, which from the context of the questioning

11  appears to be based on Dr. Hill's 2006 understanding of the term "pseudoreference", is minimally

12  probative of how one skilled in the art would have understood the term "reference counterelectrode"

13  in the mid-1980s.

14       The only evidence presented by Abbott on the issue of reconsideration that appears to be

15  "new" within the meaning of Civil Local Rule 7-9 is evidence, in the form of deposition testimony

16  and internal documents, concerning how Bayer and other defendants sometimes referred to the

17  counterelectrodes in their accused products.  (*See* evidence cited at pages 17-21 of Abbott's

18  Opposition.)  This evidence does not provide a sufficient basis for the Court to revise its

19  construction of the "reference counterelectrode" claim term.  Testimony by certain employees of

20  Bayer or of other defendants, acknowledging that they have in more recent years used the word

21  "reference electrode" to describe the counterelectrodes used in the accused products, is not

22  sufficiently probative evidence of what one skilled in the art in the mid-1980s would have

23  understood the '551 patent to mean by "reference counterelectrode."  Abbott has not demonstrated

24  that these individuals were using terms consistent with how one skilled in the art would have used

25  them in the mid-1980s.  Without such a link, such deposition testimony is not the kind of extrinsic

26

27  circumstances where this would happen nor the magnitude of such a change.  Dr. Stetter's testimony indicates only that a

28  commercial Ag/AgCl reference "resides in a solution of known chloride ion concentration" (Stetter Decl., ¶ 17), but does not state that variations of chloride concentration in blood would render the potential of an Ag/AgCl second electrode unknown relative to a standard.

1    evidence that plays a significant role in claim construction.

2         Accordingly, the Court finds no basis to alter its construction of the "reference

3    counterelectrode" claim term.

4                          **3.    Doctrine of equivalents.**

5         Abbott contends that the jury could still find infringement under the doctrine of equivalents

6    (DOE) because the "pseudoreference" counterelectrode used in the Bayer accused devices is an

7    "insubstantial difference" from the "reference counterelectrode" required by the '551 claims.[8]

8    Abbott argues that even if the potential of the counterelectrodes in the Bayer accused products is not

9    "known . . . relative to a standard", the Bayer counterelectrodes are nonetheless an equivalent.

10        Abbott has adduced sufficient evidence to create a triable issue of fact as to whether a

11   pseudoreference is an insubstantial difference from the "reference counterelectrode" required by the

12   '551 claims.   Abbott submits considerable evidence that those with ordinary skill in the art would

13   today consider a pseudoreference electrode to be interchangeable with a reference electrode.  Known

14   interchangeability is a useful objective standard of equivalency.  *See Warner-Jenkinson Co. v. Hilton*

15   *Davis Chemical Co.*, 520 U.S. 17, 36 (1997).  Abbott's expert, Dr. Johnson, has testified in detail

16   regarding the similarities between reference electrodes and pseudoreference electrodes (Johnson

17   Decl., ¶¶ 15-23), and opines that for many years those of ordinary skill in the art "have known of the

18   interchangability of the terms psuedoreference electrode and reference electrode in blood glucose

19   sensors" (Johnson Decl, ¶ 32).  Similarly, Bayer scientist Dr. Vreeke acknowledged that if he had

20   been told in 1999 to use any type of reference electrode to make a blood glucose sensor, he would

21   have understood he could use a quasireference electrode.  (Vreeke Depo. at 263:11-18, Hutcheon

22   Decl., Exh. 6.)  Relevant art in the field such as the Roche's '268 patent also supports the

23   interchangability of psuedoreference electrodes with reference electrodes, stating:  "The reference

24   electrode may also be of the type generally known as a 'pseudo' reference electrode which relies

25   upon the large excess of the oxidizing species to establish a known potential at a noble metal

26   electrode." (Johnson Decl., Exh. 11 at 6:11-19.)  Dr. Hill's testimony equating the function of a

27   _____

28   　　　　[8] For purposes of its noninfringement motion, Bayer does not contest that Abbott's characterization of the counterelectrodes in the accused devices as psuedoreferences is correct.  (Reply at 2:1-2.)  Bayer has reserved for trial the argument that its counterelectrodes do not even qualify as psuedoreferences.

**United States District Court**
For the Northern District of California

1  pseudoreference with the combination of a reference electrode and a counterelectrode also suggests

2  equivalency.  (Hill Depo. at 93-94, Hutcheson Decl., Exh. 8A.)  Finally, the evidence that Abbott

3  has submitted indicating that Defendants themselves sometimes referred to the counterelectrodes

4  used in their accused products as "reference" electrodes, although not a sufficient basis for

5  reconsideration of the Court's construction for the reasons discussed above, is certainly probative

6  evidence that one of ordinary skill in the art might consider psuedoreference electrodes and

7  reference electrodes to be interchangeable.[9]  In short, the Court finds that Abbott has provided

8  sufficient particularized testimony and linking argument as to the insubstantiality of the differences

9  between a pseudoreference electrode and a reference counterelectrode (as defined by the '745

10  patent) to create a triable issue of fact regarding infringement by equivalents.  *See Network*

11  *Commerce, Inc. v. Microsoft Corp.*, 422 F.3d 1353, 1363 (Fed. Cir. 2005).

12      The Court disagrees with Bayer that Abbott's infringement-by-equivalents argument violates

13  the precept that the doctrine of equivalents cannot be used to vitiate an entire claim element.  *See*

14  *Novartis Pharms. Corp. v. Abbott Labs.*, 375 F.3d 1328, 1339  (Fed. Cir. 2004).  Abbott's theory of

15  infringement by equivalence would not automatically read the "reference" part of the "reference

16  counterelectrode" claim limitation out of the claim, because the evidence submitted by Abbott

17  indicates that a pseudoreference counterelectrode has properties that make the potential of the

18  psuedoreference more predictable and less variable than a mere counterelectrode.  On this record,

19  Abbott is not foreclosed from arguing that pseduoreference counterelectrodes are an equivalent to

20  the "reference counterelectrode" claim limitation.

21      Accordingly, there is a triable issue of fact as to whether there is infringement by equivalents

22  by Bayer's accused products of the "reference counterelectrode" limitation in the '551 patent claims.

23      **B.      The "electrical contact" limitation.**

24      As an independent ground for a finding of noninfringement of the '551 patent, Bayer asserts

25  that the undisputed record indicates that the two electrodes in Bayer's accused products are not in

26

27

28      [9] "Insofar as the question under the doctrine of equivalents is whether an accused element is equivalent to a claimed element, the proper time for evaluating equivalency-and thus knowledge of interchangeability between elements-is at the time of infringement, not at the time the patent was issued."  *Warner-Jenkinson*, 520 U.S. at 37.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    electrical contact before the blood sample is applied.[10]  The Court disagrees.

2          The asserted '551 claims all require that the active electrode not be "in electrical contact"

3    with the reference counterelectrode before the blood sample is applied.  The Court, in construing this

4    claim limitation, has determined that two items are in electrical contract if they are "positioned or

5    connected in such a way that electricity can flow" between them.

6          Here, Abbott's expert, Dr. Johnson, has submitted testimony regarding experiments that

7    measured the resistance between the two electrodes in the accused Bayer products.  The tested Bayer

8    products were commercial strips subjected to experimentation after they were removed from the vial

9    in which Bayer sells them.  (Alva Decl., ¶ 4.)  Accordingly to Dr. Johnson, the experiment did not

10   detect any resistance below 50 megaohms.  (Johnson Decl., ¶ 62.)  Dr. Johnson opines that one of

11   ordinary skill in the art would expect the meter to provide a resistance measurement below this 50

12   megaohm threshold if there were an electrical connection between the two electrodes.  (Johnson

13   Decl., ¶¶ 62-63.)  Bayer raises no argument in its motion that Dr. Johnson's testimony regarding the

14   resistance experiment is inadmissible or unreliable.  The Court finds that, based on Dr. Johnson's

15   testimony, a reasonable jury could conclude that the two electrodes are not in electrical contact with

16   each other before the blood sample is applied.

17         Despite Dr. Johnson's tests, Bayer contends that certain deposition admissions by Dr.

18   Johnson, coupled with the tests of Bayer's own expert, establish as an undisputed fact that there is an

19   electrical connection between the two electrodes before the sample is applied.  Bayer's expert, Dr.

20   Stettler, has submitted testimony that describes experiments that measured the flow of current

21   between the two electrodes in the Bayer accused products under a variety of humidity and

22   temperature conditions.  (Stettler Decl., ¶¶ 28-30.)  The current measurements ranged from -5.4

23   picoamps (pA) to 48,111 pA for the Bayer Microfill, depending on temperature and humidity

24   conditions.  (*Id.*, ¶ 30.)  The current measurements ranged from -14 pA to 43,534 pA for the Bayer

25   Autodisc, depending on temperature and humidity conditions.  (*Id.*)  Although Dr. Johnson conceded

26   in deposition that a current in the range of 5,000 pA would establish "electrical contact" between the

27

28        [10] Abbott's has not asserted infringement under the doctrine of equivalents for the electrical contact limitation.
     Therefore, this Court's analysis is limited to literal infringement only.

1  two components (Johnson Depo. at 344:11-16, Bartlett Decl., Exh. 11), this current threshold was

2  exceeded in Bayer's experiments only under conditions in which the ambient humidity exceeded

3  75%. (Stettler Decl., Exh. E.)  At lower humidity values of 25% or 50%, and for the Microfill

4  product even at lower temperatures at 75% humidity, the measured current  was below 2000 pA.

5  (*Id.*)

6         Though Bayer posits that its tests show that the reagent layer on the Bayer accused products

7  provides an electrical path between the active and counterelectrodes even before blood is applied,

8  the  proper interpretation of the results of Bayer's tests of its own products is not undisputed on this

9  record.  Bayer's own data, together with Dr. Johnson's alternative explanations for Bayer's

10  experimental results, raise triable issue of facts as to what conclusions can be drawn from Bayer's

11  tests.  To begin with, Dr. Stettler himself admitted that the current measurements of less than 50pA

12  are "unreliable or basically within noise."  (Stetter Depo. at 150:20-151:2, Hutcheson Decl, Exh.

13  11).  All currents tested on the Bayer products at 25% humidity fell below this 50 pA "noise"

14  threshold.  (Stetter Decl., Exh. E)  Dr. Johnson's analysis of these data points raises a question as to

15  whether the measurements at higher humidity accurately reflected real-world conditions.  (Johnson

16  Decl., ¶ 69; Alva Decl., ¶ 5.)  Moreover, Dr. Johnson's testimony suggests that the sharp, twenty-

17  fold jump in measured current that occurred only when 75% humidity conditions were imposed may

18  merely be a form of ionic current that occurs when the reagent layer absorbs enough moisture from

19  the air, rather than an electrical connection that is always present. (Johnson Decl., ¶ 70.)

20         On this record, triable issues of fact remain as to whether the "electrical contact" limitation is

21  satisfied by the Bayer accused products.  The Court therefore cannot make a finding of

22  noninfringement at the summary judgment stage based on this claim limitation.

23  **II.      Roche's Motion For Partial Summary Judgment Of Noninfringement.**

24         Roche seeks summary judgment of noninfringement with respect to the '745 patent for its

25  accused product, the Aviva system.  Roche contends that the Aviva does not infringe the'745 claims

26  asserted against it (claims 1-5, 8, 11, 21-23, 28, 31 and 34) for two independent reasons: (1) no

27  mediator is present on the Aviva test strip prior to touching the sample to the test strip; and (2)

28  Abbott had no admissible evidence that the Aviva strip contains a measurement zone as defined by

the '745 patent.

**A.    Mediator on the Aviva test strip.**

Each of the independent claims of the '745 patent – claims 1, 28 and 34 – describe a method comprising multiple steps, wherein the first step is described as: "contacting a sample with an electrochemical sensor comprising: (i) an electrode pair . . ., (ii) a measurement zone, and, (iii) an analyte-responsive enzyme and a diffusible redox mediator."  (Tyler Decl., Exh. 1.)  In their March 30, 2006 Revised Joint Claim Construction Statement submission pursuant to Patent Local Rule 4-3, Abbott and Roche agreed this language means "[a]n electrochemical sensor, which includes two electrodes, a measurement zone, an analyte-responsive enzyme and a diffusible redox mediator, to which electrochemical sensor a sample is touched."  Abbott asserts literal infringement, but not infringement by equivalents, of this claim limitation.

As a threshold issue, the parties diverge in their views of how the claim limitation, and even their agreed-upon construction, should be applied to the Aviva test strip.  For purposes of Roche's motion, it is undisputed that a diffusible redox mediator, in the form of quinonediimine/phenyldiamine, gets formed on the Aviva test strip once the blood sample contacts the nitrosoaniline precursor that is present on the test strips before sample application.[11]  However, Roche contends that the claim limitation requires that the sensor include a diffusible redox mediator before it is ever contacted by the blood.  Therefore, Roche argues, there can be no infringement because Abbott is unable to prove that the Aviva test strip includes a diffusible redox mediator before it comes into contact with the blood sample.  Abbott disagrees with Roche's reading of this claim limitation, and contends that this claim limitation does not impose any temporal restrictions.  Thus, Abbott argues, the claim limitation is satisfied if at some point while the blood sample is in contact with the electrochemical sensor, the electrochemical sensor includes a diffusible redox

_____

[11] The parties do take different positions as to whether a diffusible redox mediator is present on the Aviva test strip even earlier than when the blood sample first contacts the sensor.  First, the parties disagree as to whether the chemical pair quinonediimine/phenyldiamine, which is undisputedly a mediator, is present on the strip even before introduction of the blood.  Second, the parties also disagree as to whether the nitrosoaniline "precursor", which is undisputedly present on the strip before introduction of the blood itself, itself constitutes a diffusible redox mediator.  Abbott filed a surreply, and Roche a further response to that surreply, directed at both disagreements.  However, in light of the Court's finding that Roche's non-infringement theory raised is foreclosed by a proper reading of this claim limitation, the Court need not resolve whether the evidence submitted by the parties creates a triable issue as to either of these areas of disagreement.

1  mediator.  Because there is no dispute for purposes of this motion that a diffusible redox mediator is

2  present in the Aviva sensor after the blood sample contacts the Aviva strip, but while the blood

3  sample is still in contact with the strip, Abbott argues the claim limitation is met.

4        Turning first to the parties' agreed-upon construction, the Court disagrees with Roche that

5  the agreed-upon construction clearly establishes a temporal limitation on when a mediator must be

6  present relative to when the blood first encounters any parts of the electrochemical sensor.  The

7  parties' agreed-upon construction of the claim term requires "[a]n electrochemical sensor, which

8  includes two electrodes, a measurement zone, an analyte-responsive enzyme and a diffusible redox

9  mediator, to which electrochemical sensor a sample is touched."  Although there is some ambiguity

10 in the parties' selected phrasing, this agreed-upon construction does not necessarily require that, at

11 the *first* moment any part of the sensor and the sample are touched together, the sensor must already

12 include a diffusible redox mediator.   For example, if at "time zero" the sample encounters the sensor

13 but the sensor does not yet include a mediator, and at "time one" the sensor includes a mediator and

14 the sample continues to touch the sensor, the parties' agreed-upon construction would appear to be

15 satisfied by the event occurring at "time one."  There would, at "time one", be an electrochemical

16 sensor (now including the mediator) "to which electrochemical sensor a sample is touched."

17       The Court further finds that basic claim construction principles provide a strong reason to

18 reject Roche's assertion that the claim term requires the sensor to include a diffusible redox mediator

19 at the time the blood sample first contacts the sensor.  A necessary predicate to Roche's

20 interpretation is the assumption that the step of "contacting a sample with an electrochemical sensor"

21 is an instantaneous event that occurs at a single point in time – namely, the point in time where the

22 blood first encounters the sensor.  Claim construction principles cut against this assumption.

23       As Abbott persuasively pointed out at oral argument, interpreting the step of "contacting a

24 sample with an electrochemical sensor" to encompass only a single moment in time would be flatly

25 inconsistent with several of the dependent claims in the '745 patent.  In particular, dependent claims

26 26, 29 and 37 claim a method "wherein the contacting step includes drawing the sample into the

27 sensor through an opening at the edge of the sensor from the skin of the patient into the sensor and

28 into the circular recess to contact the working electrode."  Dependent claims 32 and 35 claim a

United States District Court

For the Northern District of California

16

method "wherein the contacting step includes drawing the sample into the sensor through an opening at an end edge of the sensor strip from the sample on the skin of the patient into the sensor and first contacting a first of the working electrodes and then contacting a second of the working electrodes." Thus, each of these dependent claims describe the contacting step as "including" multiple non-simultaneous events that occur even after the sample first contacts the sensor. It would be incongruous, and would render the '745 patent claims internally inconsistent, if the Court interpreted the contacting step as an event limited to a single point in time, as proposed by Roche.

The Court is further convinced that Roche's interpretation cannot carry the day because the Court finds no real support in the patent's claims or specification for Roche's interpretation of the "contacting step" limitation. At oral argument, Roche argued that the mention in dependent claims 32 and 35 of "first contacting" and "second contacting" sheds light on how the claim drafters intended to use the word "contacting" to refer to an instantaneous event. The Court parses these words differently. It is the use of the ordinals "first" and "second" in dependent claims 32 and 35 that narrow the relevant inquiry to specific points in time for purposes of those dependent claims. The same cannot be said of the phrase "contacting . . . with", which is used to described the contacting step and does not limit the step to a single point in time. The Court also cannot ascribe significant weight to the portions of the specification that Roche cites in its reply brief, which are all discussions of specific or preferred embodiments. ('745 patent, cols. 3:24-27, 9:57-58, 23:57-59 & 45:18-21.) It is not appropriate to read these aspects of preferred embodiments into the claim language.

Accordingly, the Court is persuaded that the "contacting step" is not limited to a single point in time. Roche's non-infringement argument presented in its motion therefore cannot prevail at summary judgment, because even under Roche's version of how the Aviva strip operates, the claim limitation is satisfied as of the moment the mediator forms on the sensor, given that the blood sample is still contacting the sensor at that time. Once the mediator forms from a reaction of the blood sample and the precursor chemical, there is a sensor including a mediator "to which

1    electrochemical sensor a sample is touched."[12]

2         Because there is, at a minimum, a triable issue of fact as to whether the "contacting step"

3    claim limitation in the '745 patent is met by the Aviva strip, summary judgment of noninfringement

4    on this ground is not appropriate.

5         **B.    "Measurement zone" limitation.**

6         As a second and independent basis for a finding of noninfringement, Roche contends that

7    Abbott has identified no admissible evidence that the Aviva strip contains a measurement zone as

8    defined by the '745 patent.  The Court disagrees.[13]

9         The '745 patent claims describe a method for determining a concentration of glucose in a

10   sample by using an electrochemical sensor comprising, inter alia, "a measurement zone positioned

11   adjacent to the working electrode and the counterelectrode, wherein the measurement zone is sized

12   to contain a volume of no more than about one microliter of the sample."  The inventors of the

13   patent, acting as their own lexicographers, specifically defined the measurement zone as "a region of

14   the sample chamber sized to contain only that portion of the sample that is to be interrogated during

15   an analyte assay."  ('745 patent at 7:7-10.)  The parties expressly stipulated to this definition of

16   "measurement zone" during the claim construction process.

17        With the parties' agreed-upon construction as a backdrop, Dr. Bard's expert testimony

18   provides a factual basis upon which a reasonable jury could conclude that the Aviva test strip

19   contains a measurement zone.  Dr. Bard's testimony correlates the concept of "sample that is to be

20   interrogated" in the parties' stipulated definition with sample that is placed in the electric field

21   between the electrodes in the system.  (Bard Decl. ,¶ 23.)  Dr. Bard then provides testimony that

22

23        [12] The Court notes that other arguments advanced by Abbott in support of its interpretation miss the mark and were
24   not relied upon by the Court.  For example, Abbott argues that the steps of a method claim do not need to be performed in
     order unless that is implicitly required.  While true, this analysis is not dispositive, as the ***components*** of the sensor articulated
25   in the patent claims are not separate ***steps*** of the claimed method.  Abbott also cites to Example 9 of the '745 Patent as an
     example disclosed in the patent where a mediator precursor is not converted to a mediator until the sensor is touched by the
26   sample.  But there is no principle, or presumption, that the claims cover everything disclosed in the specification.  To the
     contrary, "when a patent drafter discloses but declines to claim subject matter, as in this case, this action dedicates the
27   unclaimed subject matter to the public."  *Johnson & Johnston Assocs., Inc. v. R.E. Serv. Co., Inc.*, 285 F.3d 1046, 1054 (Fed.
     Cir. 2002).  There is simply no requirement that the claims, as issued, cover Example 9.

28        [13] As explained below in connection with Defendants' motion for summary judgment of invalidity with respect to
     the '745 patent, the Court finds that the "measurement zone" claim limitation is not indefinite.

18

**United States District Court**
For the Northern District of California

United States District Court

For the Northern District of California

1   indicates a measurement zone is located within the Aviva test strip, whether the measurement zone

2   is intended to be a geometric space that only approximates the sample that is placed into the electric

3   field between the electrodes (Bard Decl., ¶ 49), or is more strictly drawn to correspond precisely to

4   the sample placed in this electric field during measurement (Bard Decl., ¶ 53).

5          Roche attacks the sufficiency of Dr. Bard's testimony in several ways.  First, Roche contends

6   that Dr. Bard's testimony fails to competently establish that the Aviva strip includes a physical space

7   that "contain[s] only that portion of the sample that is to be interrogated during an analyte assay", as

8   required by the parties' agreed-upon construction.  To be sure, the portions of Dr. Bard's testimony

9   directed to his view that the measurement zone may be only a geometric space that "approximates

10  the sample that is interrogated" (Bard Decl., ¶¶ 24, 49-52) may well suffer from this deficiency.

11  However, Dr. Bard also offers a separate back-up analysis that competently indicates that even if the

12  contours of the measurement zone are drawn to include exactly the sample in the sample chamber

13  that is in the electric field, the Aviva test strip would still contain a measurement zone meeting the

14  requirements of the '745 claims.  (Bard Decl., ¶ 53.)  The Court finds that this testimony raises at

15  least a triable issue of fact as to whether the Aviva strip includes a physical space that "contain[s]

16  only that portion of the sample that is to be interrogated during an analyte assay."

17         Dr. Bard concedes that, under his back-up analysis, he cannot know the precise boundaries of

18  all sides of the measurement zone in the Aviva test strip without performing a finite element

19  analysis, which he has not done.  (Bard Decl., ¶¶ 28-29, 53.)  Roche suggests that this constitutes a

20  failure of proof on Dr. Bard's part, but the Court disagrees.  Dr. Bard testifies as to how he can

21  deduce the existence of a region of the sample chamber that contains only the portion of the sample

22  that is to be interrogated, even though he has not identified its exact size or all of its boundaries.  To

23  prove infringement, the '745 patent claims do not necessarily require Abbott to establish the exact

24  boundaries of the measurement zone, so long as it can prove by a preponderance of the evidence that

25  there exists a zone that "contain[s] only that portion of the sample that is to be interrogated during an

26  analyte assay" and that satisfies the other requirements placed upon the measurement zone by the

27  '745 claims.  Dr. Bard's testimony provides a basis on which a reasonable jury could conclude there

28  is a measurement zone in the Aviva test strip that satisfies the '745 claim requirements, and his

1    testimony is not rendered insufficient merely because he cannot identify the precise contours of the

2    measurement zone in all dimensions.

3           Roche points to the testimony of its own expert, Dr. Weber, who opines that there is no

4    measurement zone in the Aviva test strip based on his analysis that the only portion of the sample

5    that is "interrogated" in the Aviva test strip is the sample to which the mediator can diffuse from the

6    working electrode before the measurement is completed.  (Weber Decl., Exh. 1 at 37-41.)  Roche

7    contends that Dr. Weber's opinions of non-infringement are "unrebutted" on this record (Reply at

8    9:16-17), but they are not.  At a minimum, Dr. Bard's testimony creates a triable issue of fact as to

9    whether the sample that is "interrogated" in the Aviva test strip includes only that sample that

10   encounters the diffusing mediator, or includes the sample that is located in the electric field between

11   the electrodes during measurement.  Dr. Bard's testimony also specifically critiques several of Dr.

12   Weber's underlying assumptions as being inconsistent with the discussion of the measurement zone

13   in the '745 specification (Bard Decl., ¶¶ 36-48), upon which a reasonable jury could rely to reject

14   some or all of Dr. Weber's ultimate opinions of non-infringement.[14]   The deposition testimony of

15   another of Roche's experts, Dr. Surridge, also provides a basis upon which a reasonable jury could

16   reject some or all of Dr. Weber's opinions, given that he indicated that some of the assumptions

17   made Dr. Bard about the measurement zone were as reasonable as the diffusion-based analysis

18   provided by Dr. Weber.  (Surridge Depo. at 414-46; Hutcheson Supp. Decl., Exh. A.)

19          Accordingly, the Court finds that, on this record and using the parties' agreed-upon

20   construction, there is a triable of issue of fact as to whether the Aviva strip has a measurement zone.

21   ///

22   ///

---

[14] For example, the '745 specification suggests the volume of the measurement zone can be defined and known in advance, based on the physical structure of the device, before any blood sample is applied, and without respect to the type of measurement or measurement time.  ('745 patent at 25:24-29; 25:39-40, 26:66-27:4, 27:21-25; 28:6-12, 28:45-49, 31:31-37.)  The '745 specification also refers to the measurement zone as a space that is pre-existing, that can be "empty" as the blood sample enters the device, that can be partially filled with material such as glass beads, that blood sample can pass through before measurement starts, and then at some point gets "filled."  ('745 patent at 29:65-30:6, 30:49-57, 38:28-31, 41:43-46, 42:5-23, 58:16-17.)  The '745 specification further indicates that glucose can diffuse into the measurement zone from portions of the sample chamber outside the measurement zone and cause errors in the measurement.  ('745 patent at 27:3-39.)  These statements in the '745 specification are in tension with Defendants' modeling of the measurement zone through a diffusion analysis.  The Court cannot, as Roche urges, adopt Dr. Weber's analysis as the only reasonable expert testimony in the record applying the measurement zone concept to the Aviva test strip.

**United States District Court**
For the Northern District of California

1  **III.    BD/Nova's Motion For Summary Judgment Of Non-Infringement.**

2       In its motion for summary judgment of non-infringement, BD/Nova contends that the BD test

3  strip does not infringe any of the asserted claims of the '745, '164, or '551 patents as a matter of

4  law.

5       **A.    The "non-flowing manner" limitation of the '164 and '745 patents.**

6       Abbott assert claims 16, 20, 22, 23, 26, 27, 34, 36-38, and 40 of the '164 patent, and claims

7  1, 3-5, 8, 11, 21-23, 26-30, 34, 37, and 38 of the '775 patent, against BD/Nova.  All of the asserted

8  claims of the '164 and '745 patents require that the blood sample be held within the strip in a "non-

9  flowing manner."  BD/Nova contends that because the blood sample within the BD test strip's

10 measurement zone flows for the entire measurement time, this claim limitation is not met by the BD

11 test strip, and there is therefore no infringement of the '164 and '745 patents.

12      In its August 31, 2006 claim construction order regarding the '164 patent, the Court

13 construed "holding the sample in a non-flowing manner within the sample chamber of the analyze

14 sensor" to mean that "the sample is not moving in the sample chamber during the measurement."

15 The Court determined that a sample that was even "flowing at a very slow rate" is "directly at odds

16 with the plain and ordinary meaning of "non-flowing."  In its July 10, 2007 summary judgment

17 order, the Court further indicated that this construction meant "something other than preventing the

18 sample from leaving the measurement zone – it requires that 'the sample is not moving in the sample

19 chamber during the measurement."

20      The undisputed record before this Court establishes that the blood sample within the working

21 electrode well in the BD test strip has a convective flow during the measurement period.  BD/Nova's

22 experts present competent evidence, in the form of both expert testimony and videotaped footage of

23 experiments, that the blood sample within the working electrode well in the BD test strip exhibits a

24 rotational swirling effect during measurement.  (Durgin Decl., ¶¶ 7-13; Wilson Decl., ¶¶ 6-8 & Exhs.

25 2-7.)  Abbott's expert, Dr. Bard, does not dispute the methodology used in these observations and

26 experiments.   To the contrary, Dr. Bard conceded that these experiments showed that there is a

27 "small amount of swirling" during measurement.  (Bard Depo. at 483:11, Dahiya Decl., Exh. 6; *see

28 also id.* at 475:14 ("It looks like, in that strip that I've seen, that there's a slight swirling in the

chamber")).  Dr. Bard concedes that this observed rotational swirling is not Brownian motion (*id.* at 490:13), and is not diffusion (*id.* at 490:15), but instead "appears to be a convective flow" (*id.* at 490:17).[15]

Against this backdrop, having reviewed the evidence submitted by Abbott, the Court concludes that Abbott has failed meet its burden of introducing evidence that would permit a reasonable jury to conclude that the sample is not moving in the sample chamber during the measurement.  The sole evidence on which Abbott relies is the testimony of its expert, Dr. Bard.  However, Dr. Bard's testimony provides no evidence that could support a finding of infringement here.

Dr. Bard's stated opinion regarding the BD test strip in his declaration is that "[t]here is no bulk movement of the sample with respect to the sample chamber in Defendants' test strips after they have filled." (Bard Decl., ¶ 59.)  Although Dr. Bard then purports to base this conclusion on observations that he made, the entirety of Dr. Bard's testimony regarding any actual observations of BD test strips reads as follows:

> [I]f there were movement of the sample, one would expect to see movement at either end of the sample chamber where resistance to movement is lowest.  However, I observed no such movement in any of Defendants' test strips.  Video Exhibits 1 and 2.

Dr. Bard's testimony is insufficient to create a triable issue of fact regarding the "non-flowing manner" claim element for at least two reasons.  First, Dr. Bard's ultimate opinion that "[t]here is no bulk movement of the sample to the sample chamber" is conclusory and insufficiently supported by foundational facts on this record.  His declaration provides no information regarding the circumstances or conditions of any observations he made.  Although his declaration references two video exhibits, it does not authenticate these exhibits, let alone describe the video's origins, the circumstances in which the videos were made, or what the videos depict.  (Bard Decl., ¶ 59.)

---

[15] Although Dr. Bard specifically referred to the rotational swirling seen in Defendant's experiments as "a convective flow", Dr. Bard has also described convection generally as a form of flow:

    Q.    Okay.  And you have a convective – and convection means flow, does it not?
    A.    Convection means that there's a velocity gradient within the solution somewhere.
    Q.    And that means flow in the solution?
    A.    I guess the not technical term would be flow.

(Bard Depo. at 495:9-14; Dahiya Decl., Exh. 29.)

United States District Court
For the Northern District of California

1    Elsewhere, Dr. Bard's declaration "incorporates by reference" pages 6-9 and Exhibits 3 & 5 of his

2    infringement expert report (Bard Decl., ¶ 76), but even his infringement report does not provide any

3    foundational facts regarding any observations that he conducted of the BD test strip, beyond the

4    threadbare assertion in his expert report that he has "personally observed the accused strips filling. . .

5    ." (Bard Decl., Exh. 3 at p. 6.)  Dr. Bard's testimony contains no other facts regarding the

6    circumstances of his "observations."  Dr. Bard therefore fails to lay an adequate foundation for his

7    ultimate conclusion that "[t]here is no bulk movement of the sample with respect to the sample

8    chamber", because he provides no information regarding the circumstances or procedures or

9    experimental conditions in which he observed the BD test strips.  On this record, a jury could not

10   reasonably regard Dr. Bard's opinion as grounded in reliable data.  A jury therefore could not

11   reasonably rely on either Dr. Bard's observations of the BD test strip or on his ultimate conclusion

12   that there is no bulk movement of the sample with respect to the sample chamber in the BD test

13   strip.  This leaves Abbott with a complete failure of proof.

14          Second, and more fundamentally, even if a jury could reasonably rely on Dr. Bard's

15   opinions, his testimony makes clear that his observations and conclusions do not speak to the

16   question of whether the sample is moving *within* the sample chamber during the measurement.  His

17   testimony is therefore insufficient to establish that this claim limitation, as construed by the Court, is

18   met.  Dr. Bard's ultimate opinion is limited to the observation that "the bulk sample itself is not

19   moving" (Bard Decl., ¶ 60) and to the question of whether there is "bulk movement of the sample

20   with respect to the sample chamber" (Bard Decl., ¶ 59).  Importantly, Dr. Bard nowhere opines that

21   there is not movement of the sample *within* the sample chamber.  He opines, merely, that there is not

22   "bulk movement" because he observed no movement of the sample "at either end of the sample

23   chamber."  (Bard Decl., ¶ 59.)  His expert report further confirms that his opinion was premised on

24   his observation that "there is no discernable flow into or out of the sample chamber" (Bard Decl.,

25   Exh. 3 at 7) and "no movement of the bulk sample in the thin capillary chamber during the

26   measurement" (Bard Decl., Exh. 3 at Exh. 5, at 3).

27          Such testimony about bulk movement of the entire sample, based on whether the sample was

28   flowing into or out of the sample chamber at the edges, does not create a triable issue of fact as to

23

United States District Court
For the Northern District of California

1    whether the sample is moving within the sample chamber, particularly given Dr. Bard's frank

2    admissions at deposition that he observed "swirling", which he equates with "convective flow" and

3    "mass transfer", within the sample chamber.  A reasonable jury would have to find, on this record,

4    that there is convective flow in the sample in the working electrode well during measurement, and

5    could not reasonably infer otherwise from Dr. Bard's conclusions, even if a reasonable jury

6    considered those conclusions to be based on reliable observations.

7            Dr. Bard's opinions concerning the use of Cottrell-type measurements in the BD test strips

8    also do not create a triable issue of fact.  Dr. Bard's declaration itself concedes that Cotrell-type

9    measurements would still work where there is "minimal" convective flow.  (Bard Decl., ¶ 61.)  At

10   deposition, he also agreed with the statement that "you can have a system with a small amount of

11   convection in the system and the Cotrell equation will still apply."  (Bard Depo. at 494:21-24; Supp.

12   Dahiya Decl., Exh. 29.)

13          Finally, Dr. Bard's opinions concerning the meaning of the Court's claim construction, even

14   if admissible, would not prevent a finding of non-infringement.  Dr. Bard opines that the Court's

15   construction should not be read so expansively as to exclude all motion, since Brownian motion and

16   diffusion are present in every liquid.  (Bard Decl., ¶ 60.)  The Court need not resolve this issue to

17   resolve the motion, however, because Dr. Bard has conceded that the motion observed in the active

18   electrode well of the BD test strip is neither Brownian motion or diffusion, but is convective flow.

19   Even if Brownian motion and diffusion within the sample chamber should not be precluded by the

20   Court's construction, the convective, swirling movement that Bard has conceded exists in the BD

21   test strip is enough to remove the BD test strip from the literal scope of the asserted '164 and '745

22   patent claims.  Because Abbott raises no argument that there is infringement under the doctrine of

23   equivalents,[16] summary judgment of non-infringement is appropriate on this record.

24   ///

25   ///

26

27          [16] Because Abbott has submitted no particularized testimony or  linking argument with respect to this claim
     limitation as to the "insubstantiality of the differences" between the claimed invention and the accused device or process,
28   or with respect to the function, way, result test, there is no triable issue of fact as to infringement under the doctrine of
     equivalents.  *See Network Commerce*, 422 F.3d at 1363.

United States District Court

For the Northern District of California

1

**B.**      **The "measurement zone positioned adjacent to the working electrode and the**

2         **counter electrode" limitation of the '745 patent.**

3         As an alternate basis for summary judgment of noninfringement of the '745 patent, BD/Nova

4 contends that the BD Test Strip's measurement zone is not adjacent to the counter electrode, and

5 therefore there can be no infringement of the '745 patent.

6         In its April 27, 2007 claim construction order, the Court construed the '745 claim limitation

7 "measurement zone positioned adjacent to the working electrode and the counter electrode" to mean

8 "the measurement zone is next to (whether or not touching) both the working electrode and counter

9 electrodes, with no other structure intervening between either electrode and the measurement zone."

10 The parties have stipulated, based on an express definition in the '745 patent, that the term

11 "measurement zone" means "a region of the sample chamber sized to contain only that portion of the

12 sample that is to be interrogated during the analyte assay."  (Dahiya Decl., Exh. 11 at 7:7-9.)

13         With the parties' agreed-upon construction as a backdrop, Dr. Bard's expert testimony

14 provides a factual basis upon which a reasonable jury could conclude that the BD test strip's

15 measurement zone is adjacent to both electrodes.  Dr. Bard's testimony correlates the concept of

16 "sample that is to be interrogated" in the parties' stipulated definition with sample that is placed in

17 the electric field between the electrodes in the system.  (Bard Decl., ¶ 23.)  Dr. Bard then provides

18 testimony that indicates a measurement zone is located within the BD test strip, whether the

19 measurement zone is intended to be a geometric space that only approximates the sample that is

20 placed into the electric field between the electrodes (Bard Decl., ¶ 35), or is more strictly drawn to

21 correspond precisely to the sample placed in this electric field during measurement (Bard Decl. ¶ 76

22 and Exh. 3 at 7-9).  Dr. Bard further testifies that the measurement zone in the BD test strip contacts

23 the surface of both electrodes.  (Bard Decl. ¶ 52 & Exh. 3 at 7-9.)

24         BD/Nova attacks the sufficiency of Dr. Bard's testimony in nearly identical ways as does

25 Roche.  For the same reasons discussed above, the Court finds that Dr. Bard offers competent

26 testimony that even if the contours of the measurement zone are drawn to precisely include exactly

27 the sample in the sample chamber that is in the electric field, the Aviva test strip would still contain

28 a measurement zone meeting the requirements of the '745 claims, including being adjacent to the

working electrode and the counterelectrode.  (Bard Decl. ¶ 52 & Exh. 3 at 7-9.)  Dr. Bard's

testimony provides a basis on which a reasonable jury could conclude there is a measurement zone

in the Aviva test strip that satisfies the '745 claim requirements, and his testimony is not rendered

insufficient merely because he cannot identify the precise contours of the measurement zone in all

dimensions.

BD/Nova's expert, Dr. Wilson, opines that the measurement zone in the BD test strip is not

adjacent to the counterelectrode based on his analysis that the only portion of the sample that is

"interrogated" in the BD test strip is the sample to which the mediator can diffuse from the working

electrode before the measurement is completed.  (Wilson Decl., ¶¶ 9-18.)   But just as with Roche,

the conflicting expert testimony creates a triable issue of fact as to whether the sample that is

"interrogated" in the BD test strip includes only that sample that encounters the diffusing mediator,

or includes the sample that is located in the electric field between the electrodes during

measurement.  Similarly, Dr. Bard's testimony specifically critiquing a diffusion model as being

inconsistent with the discussion of the measurement zone in the '745 specification (Bard Decl., ¶¶

36-48) applies with equal force to several of Dr. Wilson's underlying assumptions, and a reasonable

jury could rely on Dr. Bard's testimony to reject some or all of Dr. Wilson's ultimate opinions of

non-infringement.

Accordingly, the Court finds that, on this record and using the parties' agreed-upon

construction, there is a triable of issue of fact as to whether the BD strip has a measurement zone

that is adjacent to the working electrode and the counterelectrode.[17]

**C.**      **The "reference counterelectrode" limitation of the '551 patent.**

BD/Nova contends that the BD test strip does not have a "reference counterelectrode" as

---

[17] BD/Nova characterizes the dispute raised by its motion as "purely one of claim construction" regarding the measurement zone limitation.  (Reply at 4:13-14.)  However, the parties have already stipulated to a construction of "measurement zone."  At oral argument, at the Court's request, the parties discussed whether this claim term might benefit from further construction by the Court in light of the conflicting views of the parties' experts.  However, neither side has requested that the Court revisit or refine the construction, and the Court declines to do so *sua sponte* at the summary judgment stage.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   required by the asserted '551 claims (claims 1-4) and as construed by this Court,[18] and therefore

2   cannot infringe the '551 patent.  BD/Nova raises two independent arguments in support of this

3   contention.

### 1.      Known potential relative to a standard.

5      First, BD/Nova asserts that the counterelectrode in the BD test strip does not have a potential

6   that is "known . . . relative to a standard."  As with Bayer, Abbott concedes that the counterelectrode

7   in the BD test strip is a psuedoelectrode, and that its potential varies significantly depending on the

8   concentration of glucose in the sample.  (Opp. at 9:15.)  Once again, Abbott advances testimony by

9   its expert, Dr. Johnson, that the potentials can nonetheless be calculated for a given glucose level

10   based on assumptions about the accused products, and those calculations can be confirmed by

11   experimentally-measured potentials.  (Johnson Decl., ¶¶ 22-23.)

12      Abbott's literal infringement arguments against BD/Nova fail for the same reasons as against

13   Bayer.  A pseudoreference, having a range of potentials that can be estimated through calculation

14   and confirmed by experiment, does not have "a known potential relative to a standard."  Moreover,

15   Abbott concedes pseudoreferences fall outside the literal scope of the Court's construction.[19]

16   Accordingly, summary judgment of no literal infringement is appropriate.

### 2.      Insignificant variation in potential during measurement.

18      Second, BD/Nova asserts that the potential of the BD test strip's counterelectrode varies by

19   too much during the measurement to literally meet the claim construction's requirement that it

20   "maintains its potential with only insignificant variation during the measurement."  BD/Nova cites to

21   Abbott's expert's own experiments which indicate that the potential varied by 40mV (drifting from

22   .31V to .27V) during the measurement.  (Dahiya Decl., Exh. 19 at 8.) BD/Nova also cites to its own

23   expert's experiments which found an even larger variation, from as much as 59mV to 87mV

24

25      [18] For the same reasons discussed above in connection with Bayer, the Court declines to revise its construction of
    this claim limitation.

26

27      [19] Abbott's citations to various BD/Nova documents and witnesses that refer to the counterelectrode in the accused
    product as a "reference electrode" or as placed in a "reference electrode well" (Hutcheson Decl., Exhs. 13, 14, 15, 16, 17,
    18; Young Depo. at 125-137, Hutcheon Decl., Exh. 12; Winarta Depo. at 30-31, 43-57, Hutcheson Decl., Exh. 20) place an

28   excessive focus on talismanic language and do not raise a triable issue of fact in light of Abbott's concession that the BD test
    strip's counterelectrode is a pseudoreference.

1   depending on glucose concentration. (Wilson Decl., ¶ 24 & Exh. 8.) Abbott does not dispute these

2   quantitative results. BD/Nova's expert, Dr. Wilson, testified that this degree of variation cannot be

3   considered insignificant for a counterelectrode. (Wilson Decl., ¶ 24.) Dr. Johnson, Abbott's expert,

4   also acknowledged at deposition that a variation larger than 10mV was significant for a

5   counterelectrode. (Johnson Depo. at 73-74, Supp. Dahiya Decl., Exh. 32.) Similarly, Dr. Hill, the

6   named inventor on the '551 patent, testified that a variation of more than 20mV would be a

7   significant variation. (Hill Depo. at 97:17-23.)

8           Against this backdrop, Abbott's evidentiary showing is insufficient to even meet its *prima*

9   *facie* burden of demonstrating that the counterelectrode in the BD test strip maintains its potential

10  with only insignificant variation during the measurement. First, Abbott argues that the variations are

11  insignificant for a counterelectrode because the sensors are designed to function properly despite this

12  variation in potential, but this response is untethered to the actual claim construction at issue and

13  would improperly permit any working counterelectrode to meet this aspect of the "reference

14  counterelectrode" claim construction. Second, Dr. Johnson's own testimony does not provide any

15  reasoned basis for concluding that the 40mV variation is insignificant other than this faulty

16  hypothesis. (Johnson Decl., ¶¶ 28-30, 51-52.) His comparison of the drift in the BD test strip with a

17  commercial Abbott Precision Xtra strip is not a sufficient basis for a jury to conclude the drift in the

18  BD test strip was insignificant. Dr. Johnson's tests showed a steady drift in the BD test strip

19  (Johnson Decl., Exh. 7), where as Abbott's Precision Xtra strip showed little variation in potential

20  other than initial instability as the sample first arrived. (Johnson Decl., Exh. 6.)

21          On this record, no reasonable jury could find that the at least 40mV variation in potential for

22  the counterelectrode in the BD test strip was insignificant during the measurement period.[20] This

23  provide a second basis for concluding there is no literal infringement of the '551 patent by the BD

24  test strip.

25          **3.        Doctrine of equivalents.**

26          Given that Dr. Johnson's testimony raises a triable issue of fact as to whether the BD test

27  ─────────────────────

28      [20] Contrary to Abbott's view articulated at oral argument, the portion of the '551 specification mentioning that the invention should be operated between +50 mV to +200 mV ('551 Patent at 7:25-28) does not suggest that the potential actually varies, by this amount or by any amount, during the measurement period.

United States District Court
For the Northern District of California

strip counterelectrode is a pseudoreference (Johnson Decl. ¶ 25), the same evidence discussed above in connection with Bayer's noninfringement motion, showing a pseudoreference counterelectrode has known interchangeability with a reference counterelectrode, creates a triable issue of fact as to infringement by equivalents.

Accordingly, there is a triable issue of fact as to whether there is infringement by equivalents of the '551 patent by the BD test strip.

**D.      Filter limitation of the '551 patent.**

BD/Nova contends that there is no infringement of the '551 patent by the BD test strip because the BD test strip has a chemical barrier that prevents red blood cells from contacting the conductive portion of the working electrode.

The Court construed the claim term "wherein said active electrode is configured to be exposed to said whole blood sample without an intervening membrane or other whole blood filtering member" to mean "the active electrode is exposed to whole blood during measurement and no part of the active electrode is prevented from being exposed to the whole blood sample through use of an intervening membrane or any other component that filters whole blood."

It is undisputed that the BD test strips contain a chemical barrier that increases the viscosity of the chemistry layer on top of the gold electrode.  However, Abbott contends that a factual dispute exists as to whether red blood cells contact the working electrode during the measurement despite this layer.  Abbott points to the testimony of its expert, Dr. Johnson, which describes experiments in which there was a large variation in blood glucose readings for the same glucose level when different levels of red blood cells were present.  (Johnson Decl., ¶¶ 71-75.)  Based on those experiments, Dr. Johnson opines that it is more likely that not that the BD test strip does not prevent red blood cells from reaching the electrode.  (*Id.*)

BD/Nova attacks Dr. Johnson's testimony, pointing out that Dr. Johnson conceded in deposition that the observed "hematocrit" effect did not "necessarily" mean the red blood cells reached the electrode, because other factors could cause the hematocrit effect.  (Johnson Depo. at 140:6-141:4, Dahiya Decl., Exh. 18.)  For example, Dr. Johnson conceded that oxygen or volume effects could also contribute to an observed hematocrit effect.  (*Id.* at 139:8-18, 140:6-9.)  This

testimony, however, does not negate a jury's ability to reasonably rely on Dr. Johnson's testimony that the "most likely" explanation for the observed effect is that red blood cells touch the surface of the electrode in the BD test strip.  (Johnson Decl., ¶ 72.)   The conflict between the inferences that can be drawn from the results of Dr. Johnson's indirect tests, and the inferences that can be drawn from Dr. Wilson's observations using SEM images which found no traces of red blood cells on electrodes frozen at the end of the measurement period (Wilson Decl., ¶¶ 32, 35), leaves this Court with competing inferences that are in tension and that must be weighed by a factfinder.  The mere fact that Dr. Johnson's test results may merely constitute indirect or circumstantial evidence of infringement does not permit this Court to resolve the competing inferences in favor of BD/Nova at summary judgment.

Because of the existence of a triable issue of fact, the Court need not resolve at this time the underlying legal dispute between the parties – whether a chemical filtering agent that slows down red blood cells enough to prevent them from reaching the electrode during the measurement qualifies as a "component that filters whole blood."

### E.   Additional alleged failures of proof.

BD/Nova raise three additional arguments[21] that it concedes fall outside the scope of the restrictions on summary judgment motions that were negotiated by the parties and approved by this Court's August 13, 2007 Supplemental Case Management Scheduling Order.  In light of this concession, the Court declines to consider these arguments at this time.

## IV.   BD/Nova's Motion For Summary Judgment Of Invalidity Of The '890 Patent.

BD/Nova seeks summary judgment of invalidity with respect to the asserted claims of the '890 patent.  The claims of the '890 patent asserted against BD/Nova are independent claim 11 and its dependent claim 12.  As noted above, BD/Nova must establish by "clear and convincing" evidence, on the basis of undisputed facts, that the patent is invalid.  BD/Nova asserts two

---

[21] In particular, BD/Nova contends that: (1) the BD test strip does not meet the requirement of the '551 patent claims that the "electrodes are so dimensioned and positioned that they can be simultaneously completely covered by a single drop of whole blood", (2) Abbott has no evidence of direct infringement regarding the '164 patent because Plaintiffs have no proof that BD's customers meet the limitation of "creating an unassisted flow" when they obtain a blood sample by lancing their skin; and (3)  Abbott has failed to adduce evidence of the culpable state of mind required for indirect infringement of the '164 and '765 patents.

United States District Court

For the Northern District of California

independent grounds for invalidity: (1) that the '890 patent is anticipated by the Nankai prior art patent, and (2) that the '890 patent is obvious in light of the Ikeda prior art patent in combination with the Nankai prior art patent.

**A.     The Nankai patent.**

BD/Nova argues that the Nankai patent (Mehta Decl., Exh. 2) anticipates the '890 patent.

The Patent Act precludes the patenting of any invention that "was known or used by others in this country, or patented or described in a printed publication in this or a foreign country" before the date of its invention. 35 U.S.C. § 102(a); *see also Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1352 (Fed. Cir. 2003). Similarly, the Act provides that a patent claim is invalid if the patented invention is "described in a printed publication . . . more than one year prior to the date of the application for patent in the United States." 35 U.S.C. § 102(b); *see also Schering Corp. v. Geneva Pharm., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  To anticipate under either section 102(a) or section 102(b), a single prior art reference must disclose every limitation of the claimed invention. *See Schering*, 339 F.3d at 1377.[22]  If there is a disputed issue of material fact as to whether even a single element is disclosed in the prior art, summary judgment as to that patent claim must be denied.  *See Rockwell Int'l Corp v. United States*, 147 F.3d 1358, 1363-64 (Fed. Cir. 1998).

Anticipation is a question of fact, *see SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1343 (Fed. Cir. 2005), and the determination of whether a prior art reference is enabling "is a question of law, although based upon underlying factual findings." *Crown Operations Int'l, Ltd. v. Solutia Inc.*, 289 F.3d 1367, 1376 (Fed. Cir. 2002). "However, without genuine factual disputes underlying the anticipation inquiry, the issue is ripe for judgment as a matter of law." *SmithKline Beecham*, 403 F.3d at 1343.  The burden of proof in all instances falls upon the party seeking to establish the invalidity of a patent claim, who "must overcome the presumption of validity in 35 U.S.C. § 282 by clear and convincing evidence." *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1067 (Fed. Cir. 2003).

---

[22] Even where every limitation in the claim is not disclosed, a prior art may nevertheless anticipate the claimed invention if it inherently discloses a missing claim limitation.  It must, however, be "clear that the missing descriptive matter is necessarily present in the thing described in the reference, and that it would be so recognized by persons of ordinary skill." *In re Robertson*, 169 F.3d 743, 745 (Fed. Cir. 1999).

*United States District Court*
For the Northern District of California

1    Here, to prove anticipation, BD/Nova must clearly and convincingly establish, using

2    undisputed facts, that every element of the asserted '890 patent claims is disclosed in the Nankai

3    patent.

### 1.    Figure 12.

5    First, BD/Nova argues that Figure 12 of the Nankai patent discloses all of the elements of the

6    asserted '890 claims (claims 11 and 12).  Abbott disputes that several '890 claim elements are

7    disclosed by Figure 12 of the Nankai patent.

### a.    Directional flow.

9    Abbott disputes that Figure 12 discloses a "elongated electrode support defining a sample

10    transfer path for directional flow of the same from an application point along said electrode

11    support", one of the claim limitations of the asserted '890 claims.  This Court, in its claim

12    construction, has construed "sample transfer path" as the "route along which the sample moves", and

13    has construed "directional flow" as "the orientation and guidance in a particular direction."

14    The Court agrees with Abbott that, at a minimum, there is a disputed issue of fact as to

15    whether Figure 12 discloses a route along which the sample moves, such that the sample is provided

16    an orientation and guidance to move in a particular direction.  The Nankai patent does not disclose

17    what direction the sample will flow, or what order the sample will fill the three fingers shown in

18    Figure 12.  When the blood sample arrives at the first finger (channel #1), it is not guided in any

19    particular direction.  The sample can continue straight or take a left turn down the first finger, or

20    both.  (Heineman Decl., ¶ 16.)  BD/Nova's fluid dynamics expert, Dr. Durgin, conceded this in

21    deposition.  (Mehta Decl., Exh. 10 at 152:2-7; *see also* Hutcheson Decl., Ex. 11 at 81:24-82:8, 86:9-

22    15.)  The mere fact that blood could, according to Dr. Durgin, be expected to flow into the first

23    channel before flowing into the second channel, and into the second channel before the third

24    channel, does not establish that Figure 12 orients or guides the sample in a particular direction.

25    BD/Nova's experts acknowledged in deposition that the path that the sample will take in the Figure

26    12 device cannot be determined by looking at the figure, and would have to be determined by

27    experiments or calculations.  (Hutcheson Decl., Exh. 9 at 212:10-213:13; Exh. 11 at 86:16-89:1,

28    155:3-156:7.)  Since Figure 12 allows such movement options, and does not disclose any defined

United States District Court

For the Northern District of California

flow "in a particular direction", BD/Nova has not demonstrated by clear and convincing evidence that Figure 12 provides "guidance in a particular direction" for the blood sample.

BD/Nova's argument that the "particular direction" that the sample will be guided does not need to be predetermined (i.e., known before the sample is introduced) strains credulity. The claim language requires that the elongated electrode support "define" a route along which the sample moves with "orientation and guidance in a particular direction." The support structure cannot define such a guided route in a particular direction if the direction of movement cannot be known before the sample is introduced. Moreover, even if BD/Nova were correct that the "particular direction" need not be known beforehand, as noted above there is considerable evidence that the blood sample does not even flow in a "particular direction" once introduced, but instead splits and flows in several different directions.

Because there is a disputed issue of fact as to whether the "directional flow" limitation is disclosed by Figure 12, Figure 12 does not anticipate claim 11 or 12 of the '890 patent.

**b.     Downstream limitation.**

Abbott also disputes that Figure 12 discloses that the "reference or counter electrode [be] spaced downstream of said working electrode" (hereafter the "downstream limitation"). The Court agrees with Abbott that there is a disputed issue of material fact as to whether Figure 12 discloses a system in which the counterelectrode is "downstream" of the working electrode. Indeed, it is difficult to determine what would even correspond to "downstream" in the sample transfer path of Figure 12 given that Figure 12 does not appear to provide for flow of the sample in a single "particular direction."

BD/Nova's modified Figure 12, presented in its opening brief (Br. at 13), fails to rise to the level of a clear and convincing showing that Figure 12 discloses a counterelectrode that is "downstream" from the working electrode. The modified figure presented by BD/Nova has only a single working electrode and counterelectrode path. As an initial matter, BD/Nova asserts that Dr. Heineman (Abbott's expert) conceded that such modifications would be evident to a person of skill in the art, and that the modifications contain all elements of claims 11 and 12, but the testimony cited by BD/Nova does not establish this. (Heineman Depo. at 129-30, Mehta Exh. 6.) More

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1   fundamentally, the Nankai patent teaches that the multiple electrode system of Figure 12 was

2   designed to provide increased accuracy (Hutcheson Decl., Exh. 12 at 8:31-45), and the other

3   embodiments in the Nankai patent that include a single electrode system locate at least a portion of

4   the counter electrode upstream of the working electrode (*id.* at Figs. 4, 6, 8 & 10).  Against this

5   backdrop, BD/Nova has not come forward with clear and convincing evidence that Nankai provides

6   a teaching or suggestion to modify Figure 12 to include a one-electrode system.

7        Because BD/Nova has not shown, by clear and convincing proof, that the downstream

8   limitation is disclosed by Figure 12, Figure 12 does not anticipate claim 11 or 12 of the '890

9   patent.[23]

10       **2.       Figure 10.**

11       Second, BD/Nova argues that Figure 10 of the Nankai patent discloses all of the elements of

12   the asserted '890 claims (claims 11 and 12).  Abbott disputes that the downstream limitation of the

13   '890 claims is disclosed by Figure 10 of the Nankai patent.

14       In BD/Nova's view, Figure 10 discloses the use of two separate counterelectrodes, 5 and 5'.

15   Thus, BD/Nova argues, when sample is applied to introduction port 10, it flows across

16   counterelectrode 5, then working electrode 4, and finally counterelectrode 5'.  BD/Nova therefore

17   argues that counterelectrode 5' is spaced downstream of working electrode 4 in the sample path.

18       However, the conclusion that  Figure 10 discloses the use of two separate counterelectrodes

19   is not undisputed on this record.  "What a prior art reference discloses in an anticipation analysis is a

20   factual determination."  *Kim v. ConAgra Foods*, 465 F.3d 1312, 1325 (Fed. Cir. 2006).  The

21   specification of the Nankai patent does not directly discuss the issue, but Figure 10 shows the

22   counterelectrode pieces 5 and 5' to be in electrical contact with each other and collectively connected

23   to a single lead.  (Mehta Decl., Exh. 2 at Fig. 10.)  Moreover, Dr. Heineman, Abbott's expert, views

24   this Figure as disclosing the use of a single counterelectrode exposed in two separate places

25   (Heineman Decl., ¶ 28), an opinion that appears reasonable to the Court in light of the drawing itself.

26   Dr. Turner, BD/Nova's expert, interprets Figure 10 differently (Mehta Decl., Exh. 7 at  ¶ 6), but in

27   ──────────────

28       [23] Because BD/Nova has not established by clear and convincing proof that Figure 12 discloses the downstream limitation, combining the electrode configuration of Figure 12 with the test strip of Figure 8 would not anticipate the '890 asserted claims, since BD/Nova does not assert that Figure 8 discloses the downstream element.

1  this situation the expert's conflicting interpretations of Figure 10 create a disputed issue of fact

2  regarding what is disclosed in the prior art reference.

3        The Court disagrees with BD/Nova that Figure 10 "plainly" shows that there are two separate

4  counterelectrodes such that Dr. Heineman's testimony can be disregarded.  If anything, in the

5  absence of expert testimony, Figure 10 on its own appears to depict an electrical connection between

6  the two pieces 5 and 5' that suggests they operate as a single counterelectrode.  Moreover, the patent

7  appears to refer to 5 and 5' as counterelectrode in the singular: "By drying with heating, the

8  electrode system comprised of an electrode for measurement 4 and a counter electrode 5 (5') is

9  formed."  (Mehta Decl., Exh. 2 at 4:55-57.)[24]

10        Accordingly, the Court finds BD/Nova has not carried its burden of "clearly and

11  convincingly" establishing, with undisputed facts, that Figure 10 discloses two separate

12  counterelectrodes.  This precludes a finding that Figure 10 discloses the downstream limitation

13  element.  If pieces 5 and 5' are the same counterelectrode, then the counterelectrode disclosed in

14  Figure 10 is not "downstream" from the working electrode since the blood sample encounters the

15  counterelectrode at piece 5 before the working electrode 4.  Accordingly, the disputed state of the

16  record regarding what is disclosed in Figure 10 precludes a finding of invalidity based on the Figure

17  10 disclosure at the summary judgment stage.

18        The Court finds Abbott has failed to carry its burden of proof to establish that the Nankai

19  reference anticipates the asserted claims (claims 11 and 12) of the '890 patent.

20        **B.        The Ikeda patent.**

21        BD/Nova contends that the asserted claims of the '890 patent are obvious in light of the

22  Ikeda patent, either alone or in combination with the Nankai prior art patent.  Abbott does not

23  dispute the Ikeda patent discloses all of the elements of the claims 11 and 12 of the '890 patent; at

24  deposition, Abbott's expert, Dr. Heineman, conceded as much.  (Heineman Depo. at 154-56, De

25  Decl., Exh. 1.)

26

27        [24] The drafters of the Nankai patent also used the same kind of "prime" notation to denote two parts of a single

28  component, the spacer, in Figure 10: "Furthermore, as shown in the perspective view of the disassembled sensor in FIG. 10, the spacer may be divided into two parts of 7 and 7' and the parts may be used as the spacer 8 . . ."  (Mehta Decl., Exh. 2 at 7:56-60.)

*United States District Court*
For the Northern District of California

1    However, Abbott does dispute whether the Ikeda patent qualifies as prior art.  It is

2  undisputed that the Ikeda patent claims priority to a Japanese application filed on March 17, 1995.

3  Abbott contends that the invention claimed in the '890 patent was reduced to practice in the United

4  States before the March 17, 1995 filing date of the Ikeda patent, and that the Ikeda patent is therefore

5  not prior art that can invalidate a patent under 35 U.S.C. § 102(e).

6          **1.     Burden of proof**.

7    As the party challenging the validity of a patent based on a document published before the

8  patentee's application, BD/Nova "[bears] the burden of persuasion by clear and convincing evidence

9  on all issues relating ot the status of [the document] as prior art."  *Mahurkar v. C.R. Bard, Inc.*, 79

10  F.3d 1572, 1576 (Fed. Cir. 1996) (analyzing Section 102(a) publication prior art).  BD/Nova

11  incorrectly argues that because there is no dispute about the substance of Ikeda's invalidating

12  disclosure, the burden shifts to Abbott to show that Ikeda is not prior art.  This is not the law.

13  Although the burden of production shifts to Abbott to come forward with evidence establishing its

14  invention date, once this burden is satisfied, the ultimate burden of persuasion that the Ikeda

15  application predated the '890 invention date remains on BD/Nova, and must be established by clear

16  and convincing evidence.  *See id.* at 1578.[25]  At the summary judgment stage, assuming Abbott

17  meets its burden of production, BD/Nova must prove by undisputed facts that the Ikeda patent

18  application was filed "before the invention" by Abbott of the claimed invention in the '890 patent.

19  32 U.S.C. § 102(e) (1998) (applicable to applications filed before November 2000).

20          **2.     Prior invention.**

21    Abbott has met its burden of producing evidence that the '890 invention was embodied in

22  tangible form in the United States no later than November 1994, well before the March 17, 1995

---

[25] *Apotex USA, Inc. v. Merk & Co.*, 254 F.3d 1031, 1037-38 (Fed. Cir. 2001), cited by BD/Nova, does not directly speak to the allocation of burdens here. *Apotex* applied certain burden-shifting rules where an accused infringer asserted prior invention under 35 U.S.C. § 102(g), a different defense than the anticipation/obviousness defense asserted here by BD/Nova. Under *Apotex*, where the challenger of a patent has proven by clear and convincing evidence that "the invention was made in this country by another inventor," 35 U.S.C. § 102(g), the burden of production shifts to the patentee to produce evidence sufficient to create a genuine issue of material fact as to whether the prior inventor has suppressed or concealed the invention, although the ultimate burden of persuasion remains with the party challenging the validity of the patent. *See id.* at 1037-38. An anticipation/obviousness defense such as that asserted by BD/Nova here is distinct from a "prior invention" defense, codified in 35 U.S.C. § 102(g)(2), that invalidates a patent if, before the patentee's invention, the same invention is "made **in this country** by another who had not abandoned, suppressed, or concealed it."  (Emphasis added.)  A "prior invention" defense premised on 35 U.S.C. § 102(g)(2) is not at issue here.

United States District Court

For the Northern District of California

1   date to which the Ikeda patent claims priority.  The evidence submitted by Abbott indicates that

2   conception of the invention initially took place in the United Kingdom.  (Watkin Decl. ¶ 20; Scott

3   Decl., ¶ 17.)  The declarations of Dr. Watkin and Dr. Scott also provide competent evidence that the

4   '890 invention was reduced to practice, somewhere in the world, no later than when the 510(k) FDA

5   application was submitted in November 2004.  (Watkin Decl. ¶¶ 15-24; Scott Decl., ¶¶ 12-21.)

6   Although the evidence submitted by Abbott refers to some testing that took place in the United

7   States (Watkin Decl., ¶¶ 17, 20, 22; Scott Decl., ¶¶ 14, 17, 19), Abbott's evidence is too ambiguous

8   to ascertain whether the original reduction to practice of the '890 invention occurred in the United

9   States, or as a result of any testing conducted in the United States.

10          However, an initial reduction to practice outside the United States is not fatal to Abbott's

11  attempt to meet its burden of production.  Even assuming that the '890 invention was first reduced to

12  practice in the United Kingdom, Abbott can claim a priority date from the date that the invention

13  was first embodied in tangible form, or successfully performed, in the United States.  *See Scott v.*

14  *Koyama*, 281 F.3d 1243, 1247 (Fed. Cir. 2002) ("Reduction to practice in the United States requires

15  that the invention be embodied in tangible form in the United States, not simply reported.").[26]

16  Although Abbott's evidence that Dr. Watkin visited the United States to provide information about

17  the invention to the United States research team (Watkin Decl., ¶ 23) does not satisfy this showing,

18  the testimony that Abbott's witnesses have provided regarding the clinical trials that were performed

19  on the test strip in New Mexico, Texas and Massachusetts between August and October 1994 is

20  sufficient evidence to meet Abbott's burden of production that the '890 invention had been

21  embodied in tangible form in the United States no later than November 1994, particularly given the

22  nearly identical drawings in the 510(k) application and the '890 patent.  (Scott Decl., ¶ 23 & Exh. 8;

23  Watkin Decl., ¶ 27; Heineman Decl., ¶ 30.)[27]

24

25          [26] In contrast, for an invention conceived outside the United States, the date of conception for purposes of priority
    for a United States patent is the date the invention is first reported to the inventor's agent within the United States.  *See Scott,*
26  243 F.3d at 1247.

27          [27] To the extent BD/Nova asserts that Abbott's evidence of events occurring outside the United States is irrelevant
    to the Court's inquiry into the date of the '890 invention, the Court disagrees.  35 U.S.C. § 104 prevents Abbott from relying
28  on knowledge or use of the invention outside the United States to directly prove the date of invention, but such evidence is
    still admissible for other purposes, such as to verify the identity of the invention or the fact of a domestic reduction to

United States District Court

For the Northern District of California

1    Against this backdrop, BD/Nova does not point to any undisputed evidence that clearly and

2  convincingly establishes that the Ikeda filing date was earlier than the date of invention in the United

3  States for the claimed '890 invention.

### 3. Corroboration requirement.

5    BD/Nova contends that Abbott's evidence, even if it meets Abbot's burden of production,

6  does not satisfy the corroboration requirement imposed for proof of a prior invention. Generally

7  speaking, uncorroborated inventor testimony made in the course of litigation is insufficient to

8  establish invention. *See Woodland Trust v. Flowertree Nursery, Inc.*, 148 F.3d 1368, 1371-73 (Fed.

9  Cir. 1998). Here, however, Abbott has come forward with sufficient documentary evidence

10  (Hutcheson Decl., Exhs. 17 & 18; Scott Decl., Exhs. 1, 4, 6-9) made contemporaneously with the

11  inventive process. *See Sandt Tech, Ltd. v. Resco Metal & Plastics Corp.*, 264 F.3d 1344, 1351 (Fed.

12  Cir. 2001). Although BD/Nova accurately points out that this documentary evidence does not

13  independently demonstrate that the tests were performed in the United States, or that the 1994

14  clinical trials involved sensors that possessed every element of the asserted '890 claims, such a

15  degree of corroboration is not required. "The law does not impose an impossible standard of

16  'independence' on corroborative evidence by requiring that every point of a reduction to practice be

17  corroborated by evidence having a source totally independent of the inventor." *Medichem, S.A. v.*

18  *Rolabo, S.L.*, 437 F.3d 1157, 1171 (Fed. Cir. 2006). At this stage, where the Court must draw all

19  reasonable inferences in favor of Abbott, the Court finds that the documentary evidence submitted

20  by Abbott adequately meets the corroboration requirement.

### 4. Abandonment, suppression and concealment.

22    BD/Nova contends that Abbott cannot rely on an earlier invention date than its application

23  filing date because it allegedly abandoned, suppressed and concealed the invention. BD/Nova bears

24  the burden, at the summary judgment stage, of proving that Abbott abandoned, suppressed and

---

27  practice. *See Breuer v. DeMarinis*, 558 F.2d 22, 28 (C.C.P.A. 1977). While 35 U.S.C. § 104 does not let Abbott claim an invention date based on the date of reduction to practice in the United Kingdom, *see Scott*, 281 F.3d at 1247, Abbott can still
28  claim a date of invention as of the date an invention first conceived and/or reduced to practice outside the United States was embodied in tangible form in the United States. Abbott's evidence meets its burden of production that this happened before March 17, 1995.

United States District Court

For the Northern District of California

1   concealed its invention by clear and convincing evidence based on undisputed facts.[28]

2          BD/Nova has not met this burden.  Drawing all reasonable inferences in Abbott's favor from

3   the chronology of refinement, clinical testing, commercialization, and foreign deployment that is

4   established by the record submitted by Abbott (Scott Decl., ¶¶ 22-31; Watkin Decl., ¶¶ 28-33), the

5   Court cannot conclude that it is has been clearly and convincingly shown that Abbott abandoned its

6   invention.  Even if an inference of abandonment could reasonably be drawn from Abbott's delay in

7   filing the '890 patent application, that inference is not the **_only_** reasonable inference that can be

8   drawn.  To the contrary, examining "the circumstances surrounding [Abbott's] delay and the

9   reasonableness of that delay", *Fujikawa v. Wattanasin*, 93 F.3d 1559, 1568 (Fed. Cir. 1996), a

10  factfinder could reasonably infer that Abbott's delay was reasonable given the complexity of the

11  subject matter at issue and the fact that Abbott engaged in significant steps towards perfecting the

12  invention and commercializing the invention through much of this time period.  *See Checkpoint Sys.,*

13  *Inc. v. U.S. Int'l Trade Com'n*, 54 F.3d 756, 762 (Fed. Cir. 1995).  The question of abandonment

14  therefore cannot be resolved at the summary judgment stage.

15         Accordingly, there is a triable issue of fact as to whether the Ikeda patent renders the asserted

16  '890 claims obvious, either alone or in combination with the Nankai prior art patent.

17  **V.     Defendants' Motion For Summary Judgment Of Invalidity Of The '745 Patent.**

18         Defendants seek summary judgment of invalidity with respect to the '745 patent.[29]

19  Defendants must establish by "clear and convincing" evidence, on the basis of undisputed facts, that

20  each asserted '745 patent claim is invalid.  Each asserted claim of the '745 patent is analyzed

21  separately for purposes of invalidity.

22         Defendants assert six separate invalidity arguments: (1) that the Gotoh patent anticipates

---

[28] In this Court's view, because a valid patent has already issued to Abbott, 35 U.S.C. § 102(c) provides the legal framework under which BD/Nova's abandonment contention must be analyzed.  35 U.S.C. 102(c) provides a statutory basis for invalidating a patent where the applicant "has abandoned the invention."  The cases cited by BD/Nova – *Paulik v. Rizkalla*, 760 F.2d 1270 (Fed. Cir. 1985), *Lutzer v. Plet*, 843 F.2d 1364 (Fed. Cir. 1988), and *Fujikawa v. Wattanasin*, 93 F.3d 1559 (Fed. Cir. 1996) – all deal with interference proceedings in which no patent had yet been awarded, and where the issue of prior invention was determined under the standards of 35 U.S.C. § 105(g)(2), which allow the earlier inventor among two to prevail if that earlier inventor has not "abandoned, suppressed, or concealed" their earlier invention.  As noted above, 35 U.S.C. § 105(g)(2) is not applicable here.   Also, unlike here, no presumption of validity is afforded to the alleged first inventor in an interference proceeding.

[29] Bayer and Roche filed the motion, and BD/Nova filed a joinder in the motion.

claim 28 of the '745 patent, (2) that claim 28 of the '745 patent is invalidated by the CSL strip as a prior invention under 35 U.S.C. § 102(g), (3) that the Heller '225 reference anticipates all asserted '745 claims except claim 11; (4) that the asserted '745 claims are obvious as a matter of law, (5) that all asserted '745 claims are invalid because the term "measurement zone" is indefinite, and (6) that the specification does not enable the full scope of the asserted '745 claims.

**A.      The Gotoh patent.**

Defendants contend that the Gotoh patent, U.S. Patent No. 6,071,391, invalidates claim 28 of the '745 patent.  Abbott does not dispute the Gotoh patent is prior art.

**1.      Measurement zone less than 1 microliter.**

Abbott disputes that the Gotoh patent discloses a measurement zone of less that 1 microliter. The Gotoh patent does not use the term measurement zone nor otherwise indicate which portion of the sample is to be interrogated during the analyte assay.  Therefore, Defendants must rely on an inherency argument due to a lack of an explicit disclosure.

A disclosure is inherent only if the prior art necessarily functions in accordance with, or includes, the claim limitation.  *See MEHL/Biophile Int'l Corp. v. Milgraum*, 192 F.3d 1362, 1365 (Fed. Cir. 1999).  The mere possibility that a claim element may be present in the prior art is not sufficient to establish inherency.  *See id.*  Inherency must be proven by clear and convincing evedence.  *See In Re Cruciferous Sprout Litig.*, 301 F.3d 1343, 1349 (Fed. Cir. 2002).

Here, there is a disputed issue of fact as to whether examples B1 and D1 operate with a sample chamber size of less than one microliter.  The Gotoh reference does not describe the physical dimensions of the sample chamber or electrodes.  The Gotoh reference merely discloses that a 1 microliter glucose solution is applied to the strip.  However, the Gotoh reference does not indicate whether the sample chamber is completely filled.  The testimony of Abbott's expert, Dr. Bard, creates a triable issue as to whether glucose sensors such as the Gotoh reference may operate accurately without the sample chamber being completely filled.  (Bard Decl., ¶ 68; Bard Depo. at 399:19-402:3, 405:10-414:7, Hutcheson Decl., Exh. 5.)

Defendants' argument that the measurement zone must be smaller than one microliter, merely because the total solution applied to the strip to allow it to operate is one microliter, relies on

United States District Court

For the Northern District of California

a flawed application of the "measurement zone" concept as defined in the '745 patent. The stipulated construction of "measurement zone", based on an explicit definition provided in the '745 patent, is that the measurement zone is "a region of the sample chamber sized to contain only that portion of the sample that is to be interrogated during an analyte assay." This definition certainly requires the measurement zone to be no larger than the sample chamber, since it is a "region of the sample chamber." Defendants go a step further, and contend that the '745 patent's definition of measurement zone indicates that, in any given device, it can never be larger than the total amount of blood in the strip. The Court disagrees. Contrary to Defendants' view, the '745 patent does not define the measurement zone as a "portion" of the sample. Moreover, the use of the word "only" in the definition of measurement zone does not require that the measurement zone be no larger than the sample in the sample chamber that is being interrogated. Rather, the definition precludes the measurement zone from including sample that is not "to be interrogated", but does not preclude the measurement zone from including portions of the sample chamber that do not include any sample at all. As discussed above in connection with Roche's noninfringement motion, that the measurement zone can include portions of the sample chamber where there is no sample is made clear by the '745 specification, which indicates that the volume of the measurement zone is a pre-existing geometric space that can be defined and known in advance, based on the physical structure of the device, before any blood sample is applied. In other words, the measurement zone is a space that is pre-existing, that can be "empty" before any sample enters the device, and that later can be (but is not necessarily) filled by sample. Because Defendants have not proven by clear and convincing evidence that the sample chamber in the Gotoh reference either is less than 1 microliter, or is entirely filled by the blood sample, Defendants have failed to establish that the measurement zone in the Gotoh reference is necessarily less that 1 microliter in volume.

Defendants point to various alleged concessions by Abbott and its expert, Dr. Bard, that the measurement zone can be no larger than the volume of sample applied to a device, but all of these alleged statements were made by Abbott in connection with infringement issues concerning accused devices in which Abbott contends the blood sample is known to substantially fill the sample chamber. (Jorjani Decl., Exhs. 8 at 8, 6 at 313:23-214:18, 2 at 250:1-4.) Abbott's statements do not

41

1   categorically establish that a measurement zone in other devices, such as the Gotoh device, can

2   never be larger than the volume of sample applied to the device.

3          Accordingly, Defendants have failed to establish, by clear and convincing evidence based on

4   undisputed facts, that the Gotoh patent inherently (i.e, necessarily) operates with a measurement

5   zone of less than one microliter.

6                    **2.      Background signal limitation.**

7          Defendants' anticipation argument premised on the Gotoh patent fails for a second reason as

8   well.  On this record, there is a disputed issue of fact as to whether the Gotoh patent discloses the

9   background signal limitation of claim 28.

10          Claim 28 of the '745 patent requires that the background signal generated by shuttling be less

11   than five times the signal generated by an average normal physiological amount of glucose (the

12   analyte).  The Gotoh reference does not discuss the amount of background signal present in the

13   invention.  Therefore, Defendants bear the burden of demonstrating that this element is inherently

14   disclosed by the Gotoh reference.

15          Defendants' expert, Dr. Turner, has testified as to calculations that he performed using the

16   $(D_m t)^{1/2}$ formula stated in the '745 patent.  ('745 patent at 43:49-57.)  Specifically, Dr. Turner applied

17   a formula set forth in the '745 specification to calculate that the mediator used in the Gotoh

18   reference, ferricyanide, would diffuse a shorter distance that the spacing between the electrodes in

19   the Gotoh reference.  On that basis, Dr. Turner testifies that "background signal due to mediator

20   shutting does not occur in a strip configured as described in Example B1 of the Gotoh '391 Patent,

21   and therefore the ratio of background to analyte signal is necessarily less than 5."  (Turner Decl., ¶

22   39.)

23          The Court finds that this evidence, on its own, falls short of clear and convincing proof that

24   the Gotoh reference inherently discloses a background signal due to shuttling that is less than five

25   times the signal of glucose.  Although Defendants contend that the '745 patent teaches that there can

26   be no background signal where the spacing of the electrodes exceeds the distance derived from the

27   $(D_m t)^{1/2}$ formula, there is a triable issue of fact as to whether this is so.  The relevant portion of the

28   '745 patent reads as follows:

42

> In some amperometric or potentiometric embodiments, the redox mediator circulation is decreased by separating the working electrode from the counter or counter/reference electrode such that the distance through which the redox mediator would diffuse during the measurement period is no greater than, for example, the distance between the electrodes.  A redox mediator can diffuse a distance equal to $(D_m t)^{1/2}$, where $D_m$ is the effective diffusion coefficient for the medium between the electrodes and t is time.  For a measurement time period of 30 seconds and a redox mediator with effective diffusion coefficient between $10^{-5}$ and $10^{-6}$ cm$^2$/second, the electrodes should be separate by at least 100 μm, preferably at least 200 μm, and even more preferably at least 400 μm.

('745 patent at 43:49-62; Jorjani Decl., Exh. 1.)

Nothing in this passage states, or even directly implies, that all background signal due to shuttling is eliminated where the spacing between electrodes exceeds the $(D_m t)^{1/2}$ calculation. Defendants have not identified clear and convincing evidence from which a reasonable jury could conclude that this is so; Dr. Turner's declaration simply assumes this to be case.  (Turner Decl., ¶¶ 28-29.)

Moreover, the '745 specification's recommendation that the electrodes be spaced "even more preferably at least 400 μm" is inconsistent with Dr. Turner's assumption that no shuttling can occur if the electrodes are spaced $(D_m t)^{1/2}$ apart.  Under the assumed values provided in the passage quoted above (measurement period of 30 seconds, redox mediator with effective diffusion coefficient between $10^{-5}$ and $10^{-6}$ cm$^2$/second), the diffusion distance derived from the formula is between 54 and 173 μm.[30]  There would be no apparent need for the '745 inventors to recommend "even more preferably" a spacing of 400 μm if 200 μm eliminated *all* shuttling.  This inconsistency between Dr. Turner's assumption and the content of the '745 specification is a further reason that Defendants' evidence falls short of clear and convincing proof.

Finally, even if Defendants had come forward with a sufficient *prima facie* case that this element is inherently disclosed in the Gotoh patent, the Court finds that the testimony from Abbott's expert regarding flawed assumptions in Dr. Turner's calculations would create a triable issue of fact regarding whether all background signal due to shuttling is eliminated where the spacing between electrodes exceeds the $(D_m t)^{1/2}$ calculation.  (Bard Decl., ¶ 69 & Exh. B.)

---

[30] Defendants conceded the accuracy of this calculation at oral argument.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1    Because the record creates a triable issue of fact as to whether at least two '745 claim

2    elements are disclosed in the Gotoh reference, summary judgment of anticipation on the basis of this

3    prior art reference is inappropriate.[31]

4    **B.    The CSL Strip.**

5    Defendants assert that claim 28 of the '745 patent is invalid under 35 U.S.C. § 102(g)

6    because of a prior invention inside the United States.  In particular, Defendants contend that CSL, a

7    UK company that develops and manufactures blood glucose test strips, brought a batch of test strips

8    that satisfy claim 28 to Bayer's laboratories in Indiana where they were tested on April 28 and 29,

9    1998.  Accordingly, Defendants contend that the method of the CSL strips was practiced in the

10   United States prior to Abbott's asserted invention date of July 30, 1998.

11   The evidence adduced by Defendants concerning the CSL test strips depends heavily on the

12   testimony of James McCann, managing director of CSL.  Defendants have not produced the actual

13   test strips allegedly provided to Bayer in April 1998.  Instead, CSL has provided strips that Mr.

14   McCann has testified came from the same batch (batch 7J2210) that were brought to Bayer in 1998.

15   (McCann Depo. at 46:25-47:22, 50:6-25, 58:10-59:16; Hutcheson Decl., Exh. 9.)  Mr. McCann

16   testified that he found "one small bottle of strips in my desk, together with a load of other strips, that

17   actually labeled as that batch", and explained that he "tend[ed] to hoard particular batches of strips .

18   . . chiefly for showing to clients when they visit", and that the vial "happened to be one of the

19   batches that I had kept."  (*Id.* at 50:12-18.)  The testimony of Mr. McCann linking the CSL test

20   strips that he found (and that the parties have examined) to the CSL test strips used in April 1998 at

21   Bayer is therefore a critical part of Defendant's contention of a prior invention under 35 U.S.C. §

22   102(g).

23   Abbott has adduced evidence that raises credibility issues regarding this linchpin testimony

24   of Mr. McCann; such credibility issues will require resolution by the jury.  *See Anderson v. Liberty*

25   *Lobby, Inc.*, 477 U.S. 244, 255 (1986); *Rockwell Int'l Corp.,* 147 F.3d 1358, 1361 (Fed. Cir. 1998).

26   First, there is sufficient evidence from which a reasonable jury could infer bias.  Mr. McCann has a

27

28   [31] In light of these two genuine issues of disputed fact, the Court does not reach the parties' disagreement over whether the Gotoh reference discloses two other '745 claim elements: (1) a measurement zone adjacent to the working electrode and counterelectrode, and (2) the non-flowing limitation.

United States District Court

For the Northern District of California

1    financial interest in the outcome of this litigation and an apparent interest in obtaining an

2    invalidation of the '745 patent, given that his company, CSL, sells strips that compete with Abbott in

3    the low volume blood glucose sensor market (McCann Depo. at 108:6-109:11, 126:24-127:1,

4    Hutcheson Decl., Exh. 9), and which Abbott contends infringe the '745 patent.  Mr. McCann sided

5    with Bayer in this litigation enough to cooperate with Bayer's attorneys and to volunteer to take

6    detailed measurements of the CSL test strips in support of Bayer's litigation efforts, and he met with

7    Bayer's attorneys for at least 6 hours to prepare for his deposition.  (McCann Depo. at 126:11-128:9,

8    Hutcheson Decl., Exh. 9.)

9         Second, at least one contemporaneous document contains information from which a

10   reasonable jury could infer, drawing all inferences in Abbott's favor, that the device sent by CSL to

11   Bayer did not have the same dimensions and volumes as the test strip that Mr. McCann provided and

12   that the parties' experts have had an opportunity to measure.  That document, a September 16, 1998

13   letter from Mr. McCann, described results from "our first batch of 1 [microliter] glucose sensors.

14   These require sample volume of 0.9 microliter and are 'flooded' by a 1 [microliter] sample."

15   (Hutcheson Decl., Exh. 14.)  Mr. McCann attached pictures of the new and old devices to the letter,

16   and admitted in deposition that the picture he labeled as the old 2 microliter device was the same

17   device that Bayer tested in April 1998.  (McCann Depo. at 185:3-187:3, Hutcheson Decl., Exh. 9.)

18   Though Mr. McCann later testified the description of "sample volume" in the letter is a reference to

19   the blood drop size (McCann Depo. at 179:2-19, Jorjani Decl., Exh. 38), rather than the sample

20   chamber size, a reasonable jury could disbelieve this testimony if they found his testimony to be

21   non-credible because of bias or self-interest.

22        Because there is a triable issue of fact regarding the credibility of Mr. McCann's testimony

23   that the device that Mr. McCann provided during his deposition is identical to the device used at

24   Bayer in April 1998, summary judgment of invalidity with respect to the CSL strip is inappropriate.

25   Accordingly, the Court need not reach the other arguments that Abbott raises with respect to the

26   CSL test strip.

27        **C.    The Heller '225 reference.**

28        Defendants contend that the Heller '225 reference anticipates all claims of the '745 patent

1    asserted against Roche except claim 11, under 35 U.S.C. § 102(a).[32]   Abbott does not dispute that

2    the Heller reference is prior art.

3                **1.    Elements of the '745 patent claims disclosed in the '225 reference.**

4          Roche's expert, Dr. Weber, analyzed every element of the '745 claims asserted against

5    Roche and, except for elements unique to claim 11, found them all present in the Heller '225

6    reference.  (Weber Decl., Exh. 1 at 42-61 & attached claim chart.)  Dr. Weber's analysis explains in

7    detail where each element of the asserted '745 claims is found in the '225 reference.   The Court,

8    having compared Dr. Weber's detailed citation to the '225 reference with the content of the '225

9    reference itself, finds Dr. Weber's testimony to be well-supported.  The Court finds that Dr. Weber's

10   testimony constitutes a *prima facie* showing, sufficient to meet the clear and convincing standard,

11   that except for claim 11, every element of the '745 claims asserted against Roche is present in the

12   Heller '225 reference.

13          Other than with respect to two elements (the diffusible redox mediator element and the non-

14   flowing limitation), Abbott makes no effort in its opposition brief to challenge Dr. Weber's analysis

15   or conclusions that elements in the '745 claims asserted against Roche are disclosed in the '225

16   reference.  Similarly, in his rebuttal expert report, Abbott's expert, Dr. Bard, focused his attention

17   solely on the diffusible redox mediator element, but did not otherwise contest Dr. Weber's

18   conclusion that other '745 claim elements are disclosed in the '225 reference.  (Jorjani Decl., Exh. 7

19   at 24; *see also* Bard Depo. at 158:14-24, Jorjani Decl., Exh. 2.)  Indeed, Dr. Bard acknowledged at

20   deposition that of the items he could identify that were inventive in the '745 patent but were not

21   already disclosed in the '225 reference, none of them were elements of the '745 claims asserted

22   against Roche.  (Bard Depo. at 203:24-205:3, 207:18-208:23.)  The Court therefore finds that, on

23   this record, Defendants have established by clear and convincing proof, on the basis of undisputed

24   evidence, that every element in claims 1-5, 8, 21-23, 28, 31 and 34 of the '745 patent, with the

25   possible exceptions of the diffusible redox mediator element and the non-flowing limitation, is

26   disclosed in the '225 reference.

27

28        [32] Abbott has asserted claims 1-5, 8, 11, 21-23, 28, 31 & 34 of the '745 patent against Roche.  Abbott has asserted
     additional '745 claims against other Defendants.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

Abbott does argue that the question of whether the '225 reference anticipates the '745 patent must go to a jury simply because the PTO Examiner previously considered the '225 reference in connection with issuance of both the '745 patent and its parent, U.S. Patent No. 6,338,790. (Hutcheson Decl., Exhs. 2 at p. 4 & 18.)  The Court disagrees.  The mere fact that the PTO Examiner had been cited the reference does not create a triable issue of fact on this record.  Although deference to the Examiner's expertise is appropriate, that deference is expressed in patent litigation as a presumption of validity that requires Defendants to prove anticipation by clear and convincing evidence.  However, "the presumption is one of law, not fact, and does not constitute 'evidence' to be weighed against the challenger's evidence." *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258-59 (Fed. Cir. 2004).[33]

### a.   Diffusible redox mediator.

Abbott asserts that the '225 reference does not disclose the use of a diffusible redox mediator,[34] but the plain language of the reference belies this assertion.  The '225 reference discloses:

> More preferably, the redox mediators of the present invention are bound or otherwise immobilized on the working electrode 22 to prevent undesirable leaching of the mediator into the sample.  A diffusing or leachable (i.e., releasable) redox mediator is not desirable when the working and counter electrodes are close together. . . .

[33] Moreover, Abbott's submission of a small portion of the prosecution history of the '760 patent (Hutcheson Decl., Exh. 18), which is the parent to the '745 patent, creates an incomplete record from which this Court cannot determine how the Examiner ultimately responded to the patentee's arguments concerning the Heller reference.  The document that Abbott has provided appears to be an amendment submitted by the '760 patent applicant, and appears to indicate that the Heller reference, together with other references, had been previously cited by the Examiner as a basis for a Section 103 obviousness rejection.  (Hutcheson Decl., Exh. 18 at TH0042833.)  In the amendment, the applicant argued that "Heller does not teach the use of diffusible mediators", but the document does not include the Examiner's response nor indicate whether any claims were allowed based on the applicant's argument.   (*Id.*)  In any event, the applicant's argument was made in the context of a Section 103 obviousness rejection, where the fact that the '225 references teaches away from the use of a diffusible mediator (although disclosing it) could have a significant impact upon the motivation to combine references.  As discussed below, the fact that the '225 reference teaches away from diffusible mediators is irrelevant to the anticipation inquiry.

[34] The Court finds that Abbott is not judicially estopped from making this assertion.  In the claim construction brief and Markman hearing slides to which Defendants cite (Docket No. 189-1 in Case No. 3:04-cv-02123-MJJ & Jorjani Decl., Exh. 24), Abbott did not take the position that diffusible mediators were disclosed in the '164 specification (which is identical to the '225 reference's specification).  Rather, Abbott took the position that claim 16 of the '164 patent could not be limited to an immobilized mediator because an immobilized mediator was simply a preferred embodiment.  It does not necessarily follow from Abbott's claim construction argument – essentially, the argument that the claims were not limited to a specific type of mediator – that the '164 specification disclosed the use of diffusible mediators or any specific type of mediator.  Accordingly, imposition of judicial estoppel is not appropriate on this record.

1    (Jorjani Decl., Exh. 23 at 9:25-29.)

2         This is not the only disclosure of using a diffusible redox mediator in the '225 reference; the

3    reference also indicates that "[p]referably, there is little or no leaching of the redox mediator away

4    from the working electrode" and that "[i]n general, mediators suitable for use in the invention have

5    structures which prevent or substantially reduce the diffusional loss of redox species during the

6    period of time that the sample is being analyzed."  (Jorjani Decl., Exh. 23 at 9:22-24 & 10:25-27.)

7    Both passages acknowledge the possibility of using a leaching or diffusing mediator, although

8    clearly the drafters preferred those that did not leach or diffuse.  Moreover, independent claim 127 in

9    the '225 reference calls for a "redox mediator on its working electrode" and its dependent claim 128

10   states that the redox mediator is a non-leachable mediator, implying under principles of claim

11   differentiation that the redox mediator in claim 127 includes leachable mediators.  (*Id.* at 63.)

12        Thus, the '225 reference clearly discloses the use of a diffusible redox mediator as a means

13   of practicing the disclosed invention, even though the reference indicates that an immobilized (rather

14   than diffusible) redox mediator is the "preferred" or "desired" method of practicing the invention.

15   Dr. Weber, Roche's expert, so testifies.  (Weber Decl., Exh. 1 at 42-43 & attached claim chart.)

16   Abbott's countervailing evidence fails to create a triable issue of fact on this point.  In fact, the

17   expert put forward by Abbott regarding this invalidity question, Dr. Bard, concedes that the Heller

18   '225 reference discloses that diffusible mediators can be used, although they are not preferred.

19   (Bard Depo. at 141:23-25, 142:9-143:5, 158:14-24, Jorjani Decl., Exh. 2.)[35]

20        With no support from its own expert, Abbott instead cites to testimony from an expert report

21   of Dr. Turner, an expert witness for co-defendant Bayer.  However, Dr. Turner's testimony does not

22   raise a triable issue of fact as to whether the use of a diffusible redox mediator is disclosed in the

23   '225 patent.  Dr. Turner does not deny that the '225 reference discloses diffusible redox mediators,

24   but simply opines that the '225 reference "teach[es] one of ordinary skill in the art not to use

25   diffusible mediators" (Turner Depo. at 257:8-20, Hutcheson Decl., Exh. 16; *see also id.* at 263:3-

26

27   ────────────

28   [35] In his rebuttal expert report, Dr. Bard's did not affirmatively assert that diffusible redox mediators were not disclosed in the '225 reference; instead, he merely opined that "reasonable minds can differ" about whether it is disclosed. (Jorjani Decl., Exh. 7 at 24.)

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    266:24; Hutcheson Decl., Corrected Exh. 15 at 16-17)[36] and "teaches a way [sic] from using

2    diffusible mediators." (Turner Depo. at 265:16-17, Hutcheson Decl., Exh. 16.) While Dr. Turner's

3    testimony supports Abbott's view that the '225 reference "teaches away" from a diffusible mediator,

4    it does not provide a basis upon which a reasonable jury could conclude that a diffusible mediator is

5    not disclosed. A reference anticipates an invention even if, after disclosing the invention, the

6    reference then disparages it. *See Upsher-Smith Labs., Inc. v. Pamlab, L.L.C.*, 412 F.3d 1319, 1323

7    (Fed. Cir. 2005); *Celeritas Techs., Ltd. v. Rockwell Int'l Corp.*, 150 F.3d 1354, 1361 (Fed. Cir.

8    1998). "[T]he question whether a reference 'teaches away' from the invention is inapplicable to an

9    anticipation analysis." *Upsher-Smith*, 412 F.3d at 1323. In any event, even if Abbott could point to

10   expert testimony that there is no disclosure of a diffusible redox mediator in the '225 reference

11   (which it cannot), such expert testimony would be directly contrary to the plain language of the

12   reference, and could not create a genuine issue of disputed fact.

13                              **b.      Non-flowing limitation.**

14          No disputed issue of fact exists as to whether the Heller '225 reference discloses the "non-

15   flowing limitation" of the '745 patent. The Heller '225 reference explicitly states that "[t]he

16   potential is preferably applied after the sample has come to rest in the sample chamber." (Jorjani

17   Decl., Exh. 23 at 24.) As this Court has previously determined in its claim construction order on the

18   '164 patent (which has the same disclosure as the Heller '225 reference), "[a]s the ['164]

19   specification indicates, it is important to the proper functioning of the sensor that the sample be at

20   least temporarily immobilized during measurement." (Jorjani Decl., Exh. 11 at 15:23-25.) In

21   support of its contention that the non-flowing limitation is not disclosed, Abbott points only to the

22   testimony of Defendant's expert, Dr. Durgin, regarding the need for experimentation to determine

23   whether the BD test strip meets the non-flowing limitation for infringement purposes. (Durgin Depo

24   at 110-11, Hutcheson Decl., Exh. 7.) This testimony does not create a triable issue of fact, because

25   the non-flowing limitation is expressly disclosed in the Heller '225 reference, and there is thus no

26   need to resort to an inherency argument.

27   ───────────────

28   [36] Abbott filed a corrected version of Exhibit 15 on January 14, 2008. The corrected Exhibit 15 (cited as "Corrected Exh. 15") is the invalidity report that Dr. Turner prepared for BD/Nova. The original Exhibit 15, an expert report that Dr. Turner prepared on behalf of Bayer, is also in the record and is cited below as "Original Exh. 15."

2.      **Enabling reference.**

In the alternative, Abbott argues that even if the diffusible redox mediator element and non-flowing limitation are disclosed in the '225 reference, Dr. Turner's deposition testimony and expert report create a triable issue of fact as to whether the '225 reference is enabling for purposes of an anticipation analysis. *See In re Paulson*, 30 F.3d 1475, 1479 (Fed. Cir. 1994) ("the reference must be enabling and describe the applicant's claimed invention sufficiently to have placed it in possession of a person of ordinary skill in the field of the invention."); *Symbol Technologies, Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991). The testimony that Abbott identifies (Turner Depo. at 260, Hutcheson Decl., Exh. 16) is grounded in Dr. Turner's view that the '164 patent (which has the same disclosure as the '225 reference) "teaches away" from the use of a diffusible mediator, and against this backdrop, he opines that one could not make the invention if required to "us[e] the teachings of the '164 patent." (*Id.*) Dr. Turner expressed a similar view in his expert report for BD/Nova. (Hutcheson Decl., Corrected Exh. 15 at p. 17.)[37] In context, this testimony simply does not speak to the relevant enablement question: whether one or ordinary skill could, using the information in the '164 patent, could construct a sensor with a diffusible mediator and a measurement zone smaller than a microliter.[38] However, Abbott's own expert, Dr. Bard, does directly opine on the enablement question in his report, and entirely undercuts Abbott's position by testifying that "[o]ne of ordinary skill in the art could make a sensor with diffusible mediators using the teachings of the '164 Patent whether the '164 Patent explicitly discloses them or not." (Jorjani Decl., Exh. 7 at 24.) Based on this record, and the testimony of Abbott's own expert, a reasonable jury would have to conclude that the '225 reference enables the asserted '745 claims.

At oral argument, Abbott also contended that a footnote in Defendants' opening brief, which

[37] Dr. Turner's view in his BD/Nova expert report that "the inventors of the '164 Patent did not possess a method of constructing an analyte sensor for determining the concentration of an analyte from 500 nL or less of a body fluid, except by using an immobilized sensor" (Hutcheson Decl., Corrected Exh. 15 at p. 17) does not create a triable issue as to whether the '225 reference enables the asserted '745 claims. This testimony does not directly speak to what one of ordinary skill in the art would be able to construct using the '164 disclosure. Even if it did, the '164 claim limitation with which Dr. Turner was concerned included a 500 nL limitation on body fluid not found in the asserted '745 claims.

[38] Indeed, in his expert report on behalf of Bayer, Dr. Turner expressed his view regarding enablement that does not support Abbott. Dr. Turner indicated that, in his opinion, the use of diffusing mediators in a small strip with electrodes spaced less than 1000 μm apart was obvious to one of ordinary skill in September 1998. (Hutcheson Decl., Original Exh. 15 at 60.)

states that "Dr. Weber concluded that claim 8 of the '745 patent is disclosed by the Heller '225

reference but that the disclosure is not enabling" (Br. at 14 n.18), creates a triable issue of fact

regarding enablement at least with respect to claims 8 and 11.  However, upon reviewing Dr.

Weber's actual testimony, Defendants' footnote itself appears to be an inaccurate summary of Dr.

Weber's testimony and opinions.  Dr. Weber did not testify, anywhere in his declaration or expert

report, that claim 8 of the '745 patent is not enabled by the disclosure of the use of amperometry in

the '225 reference.  Rather, Dr. Weber simply indicated that:

> Though the [Heller '225] patent focuses on coulometry, it certainly
> mentions measurement by amperometry e.g., page 26, near line 13.
> However, the text of the '225 patent is very similar to that of the '745
> patent, and provides essentially no description of how one would build
> and use an amperometric system.

(Weber Decl., Exh. 1 at 56.)  This testimony does not express any view as to whether a person with

ordinary skill in the art would, using the '225 reference as a guide, be able to construct an

amperometric sensor satisfying the requirements of claim 8 of the '745 patent.  In this Court's view,

on such a record, an inaccurate footnote in Defendants' own brief does not constitute the quantum of

evidence sufficient to raise a triable issue of fact as to whether the '225 reference enables claims 8

and 11, because no reasonable jury could conclude that the footnote accurately states Dr. Turner's

position.

Accordingly, the Court find that claims 1-5, 8, 21-23, 28, 31 & 34 of the '745 patent are

anticipated by the Heller '225 reference.

**D.      Obviousness.**

Defendants contend that the Gotoh patent, the CSL strip, and the Heller reference, in

combination, render all claims of the '745 patent asserted against Roche obvious.  Because the Court

has found that claims 1-5, 8, 21-23, 28, 31 & 34 are anticipated by the Heller '225 reference, the sole

asserted claim that must be analyzed for Section 103 obviousness is claim 11 of the '745 patent.

However, given that there are disputed issues of fact as to whether the CSL strip can be considered

prior art at all, the Court cannot consider the CSL strip as part of the available prior art for purposes

of this Motion.  Accordingly, the sole question before the Court at this stage is whether undisputed

facts establish, by clear and convincing evidence, that the Heller '225 reference, in combination with

1    the Gotoh patent, renders claim 11 obvious.

2          To prove that a patented invention is invalid as obvious, the accused infringer must identify

3    prior art references "which alone or combined with other references would have rendered the

4    invention obvious to one of ordinary skill in the art at the time of invention." *Al- Site Corp. v. VSI*

5    *Int'l, Inc.*, 174 F.3d 1308, 1323 (Fed. Cir. 1999) (citations omitted). "Obviousness is a question of

6    law premised on underlying findings of fact." *Eolas Techs. Inc. v. Microsoft Corp.*, 399 F.3d 1325,

7    1332 (Fed. Cir. 2005).  These underlying factual determinations include: (1) the scope and content of

8    the prior art; (2) differences between the prior art and the claims at issue; (3) the level of ordinary

9    skill in the art; and, if necessary, (4) secondary evidence of nonobviousness. *See Para-Ordnance*

10   *Mfg., Inc. v. SGS Imps. Int'l, Inc.*, 73 F.3d 1085, 1087-88 (Fed. Cir. 1995). Like anticipation, the

11   affirmative defense of obviousness must be established by clear and convincing evidence. *See*

12   *Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1353 (Fed.Cir.

13   2003).[39]

14         Here, the Court concludes that Defendants have failed to meet their burden.  Dr. Weber's

15   declaration and attached expert report (Weber Decl., Exh. 1 at 61-62) do not contain sufficient non-

16   conclusory testimony on the subject of obviousness to permit a reasonable jury to conclude, by clear

17   and convincing evidence, that one of ordinary skill in the art would combine the Heller and Gotoh

18   references.  This is particularly true where (as discussed above) the '225 reference undisputedly

19   teaches away from the use of a diffusible redox mediator.  Defendants' evidentiary submission

20   simply falls short of a *prima facie* showing that one of ordinary skill in the art would, despite the

21   warnings against using diffusible mediators in the Heller '225 reference, have an apparent reason to

22   combine the Heller reference with the diffusible mediator strips of Gotoh.  *See In re Gurley*, 27 F.3d

23   551, 553 (Fed. Cir. 1994).  Dr. Weber's brief discussion of obviousness is not directed specifically

24   to the combination of these two specific references, and fails to rise to the level of clear and

25   _____

26   [39] The Supreme Court has recently clarified the test for obviousness, specifically the analysis applicable to whether
     there exists some "teaching, suggestion or motivation" ("TSM") to combine prior art references, which has traditionally been
27   a requirement for a finding of obviousness. The Court described the TSM test as a "helpful insight" rather than a rigid
     formula, and held that "the analysis need not seek out precise teachings directed to the specific subject matter of the
28   challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art
     would employ."  *KSR Int'l Co. v. Teleflex Inc.*, 127 S.Ct. 1727, 1741 (2007). The Court further emphasized the need for
     courts to value "common sense" over "[r]igid preventative rules."  *Id.* at 1742-43.

United States District Court

For the Northern District of California

1    convincing proof.

2        **E.    Indefiniteness.**

3        Defendants contend that the claim term "measurement zone" is indefinite, rendering every

4    claim in the '745 patent invalid.  Indefiniteness is an issue closely related to claim construction.  In

5    determining whether the claim is sufficiently definite, the Court must analyze whether one skilled in

6    the art would understand the bounds of the claim when read in light of the specification.  *See Allen*

7    *Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1348 (Fed. Cir. 2002).  However, "[o]nly claims not

8    amenable to construction or insolubly ambiguous are indefinite."  *Halliburton Energy Services, Inc.*

9    *v. M-I LLC*, 514 F.3d 1244, 1250 (Fed. Cir. 2008) (quotations omitted).  "If the meaning of the claim

10   is discernible, even though the task may be formidable and the conclusion may be one over which

11   reasonable persons will disagree, we have held the claim sufficiently clear to avoid invalidity on

12   indefiniteness grounds."  *Id.* at 1249.

13       Here, Defendants contend that the '745 claims are indefinite because a person of skill in the

14   art could not determine whether a co-planar, amperometric sensor, such as those accused of

15   infringement in this case, has a measurement zone as required by the patent claims.  The Court finds

16   Defendants' argument unavailing for several reasons.  To begin with, the parties stipulated to a

17   construction of the "measurement zone" term, which cuts against any conclusion that the term is not

18   amenable to construction.  The inventors of the patent, acting as their own lexicographers,

19   specifically defined the measurement zone as "a region of the sample chamber sized to contain only

20   that portion of the sample that is to be interrogated during an analyte assay." ('745 patent at 7:7-10.)

21   Although the parties' experts have arrived at competing views over whether the accused Aviva and

22   BD test strips contain a measurement zone within the definition of the '745 patent, all three experts

23   (Drs. Weber, Wilson and Bard) premised their conclusions on their specific understanding of what a

24   measurement zone is as taught by the '745 patent.  The mere fact that these experts, when applying

25   the claim term to the accused device, can reasonably disagree about the location and scope of the

26   measurement zone does not render the claim term indefinite.  *See Halliburton*, 514 F.3d at 1249.

27       Moreover, the Court notes that the '745 patent provides not only an express definition of the

28   "measurement zone" claim term (which the parties have stipulated to for claim construction

**United States District Court**

For the Northern District of California

1    purposes), but considerable additional information regarding how the measurement zone can be

2    identified for various electrode configurations, which sheds light on the meaning of the phrase

3    "portion of the sample that is to be interrogated" found in the inventors' express definition.  While

4    those descriptions are not rigorously precise, they provide adequate guidance as to the shapes and

5    contours of measurement zones for devices with either facing or co-planar electrodes.[40]  *Cf. Xerox*

6    *Corp. v. 3Com Corp.*, 458 F.3d 1310, 1323 (Fed. Cir. 2006) ("While those descriptions are not

7    rigorously precise, they provide adequate guidance as to the types of symbols that are 'well

8    separated from each other in sloppiness space,' particularly in light of the difficulty of articulating a

9    more exact standard for the concept.").  This Court finds that because the inventors provided "a

10   general guideline and examples sufficient to enable a person of ordinary skill in the art to determine"

11   whether the measurement zone limitation is satisfied by an accused device, the '745 claim terms are

12   not indefinite.  *In re Marosi*, 710 F.2d 799, 803 (Fed.Cir.1983).

13           **F.      Enablement.**

14            Defendants contend that the '745 patent claims are not enabled because all of the patent's

15   claims cover co-planar amperometric devices, but the '745 specification does not disclose how to

16   construct or measure a "measurement zone" in such a device.

17           The Court finds that, on the record before it, there is a triable issue of fact as to whether the

18   '745 specification discloses how to construct a co-planar, amperometric device with a "measurement

19   zone."  Dr. Bard's testimony on this subject indicates that whether the measurement zone is intended

20   to be a geometric space that only approximates the sample that is placed into the electric field

21   between the electrodes, or is more strictly drawn to correspond precisely to the sample placed in this

22   electric field during measurement, a person of ordinary skill in the art would be able to construct,

23   without undue experimentation, a co-planar amperometric sensor with a measurement zone that

24   _____

25           [40] For example, discussing a specific embodiment with co-planar electrodes, the specification provides information
     as to the size and location of the measurement zone.  ('745 Patent at 26:18-23, 26:59-27:5).  It indicates that the "sample

26   chamber 26 is in contact with both electrodes and is bounded on the side opposite the electrodes by a non-conducting inert
     base." (*Id.* at 26:18-23.)  It further indicates that in such a situation, the "sample chamber 26 is the space between the two

27   electrodes 22, 24 and/or the inert base 30." (*Id.* at 26:60-62.)  The specification indicates that in this co-planar embodiment,
     "the measurement zone has a volume that is approximately equal to the volume of the sample chamber.  In a preferred

28   embodiment the measurement zone includes 80% of the sample chamber, 90% in a more preferred embodiment, and about
     100% in a most preferred embodiment." (*Id.* at 26:66-27:5.)

satisfies the '745 claims by keeping the total sample chamber size less than a micoliter.  (Bard Decl., ¶¶ 56-57.)  A reasonable jury could conclude, from Dr. Bard's overall testimony explaining the basis for his enablement opinion (Bard Decl., ¶¶ 11-29, 35), that the '745 specification would enable one of ordinary skill in the art to construct a co-planar, amperometric device within the scope of the claims.[41]  As discussed above in connection with Roche's and BD/Nova's non-infringement motions, there is of course conflicting testimony from Defendants' experts that creates a dispute of fact over whether building a device in this manner would indeed contain a measurement zone satisfying the '745 claims, but this factual dispute cannot be resolved at the summary judgment stage.

The Court also cannot accept Defendants' argument that the Court should reject Dr. Bard's explanation that one could ensure the measurement zone in a co-planar, amperometric device is less than a microliter by making the total capacity of the sample chamber less than one microliter.  Dr. Bard's explanation does not, as Defendants argue, somehow "vitiate" the measurement zone claim element.  The parties' stipulated construction of the measurement zone indicates that the measurement zone is a "region of the sample chamber."  It is logical to infer from this construction, as Dr. Bard does, that if a device has a measurement zone, and if a device has a sample chamber of less than one microliter, the measurement zone is necessarily less than one microliter as well.  Moreover, nothing in the parties' stipulated construction precludes the measurement zone from including the entirety of the sample chamber.  Indeed, the '745 specification expressly indicates when discussing several specific embodiments that in "a most preferred embodiment" the measurement zone includes "about 100%" of the sample chamber.  ('745 patent at 27:1-4.)

Nor is the Court persuaded that the '745 patent is not enabled merely because Dr. Bard

---

[41] Defendants contend that in Figure 2, the only figure of the '745 patent discussing a co-planar electrode arrangement, "the sample chamber is erroneously described as being located in the 'space between' the electrodes, as it would be in a facing electrode configuration."  (Mot. at 19:24-25.)  This is itself an inaccurate characterization of the '745 patent, which states: "In the embodiment of the invention illustrated in FIGS. 1 and 2, sample chamber 26 is the space between the two electrodes 22, 24 *and/or the inert base 30.*"  ('745 patent at 26:60-62, emphasis added.)  Defendants also, rather egregiously, overstate Dr. Bard's purported concession on this issue.  Defendants characterized the '745 specification inaccurately when asking Dr. Bard about it (Bard Depo. at 65:13-16 & 65:24-66:3, Jorjani Decl., Exh. 2), rendering the meaning of his response ("I see it, but I don't agree with it", *id.* at 66:4) ambiguous.  Moreover, Dr. Bard interrupted the next question to retract his answer: "Wait, no, no, let me – let me look at this again.  I'm sorry.  Let me look carefully at Figure 2.  I'm sorry.  I have to go back and see what some of these elements are."  (*Id.* at 66:5-10.)

United States District Court
For the Northern District of California

1    testified that, to determine whether the measurement zone was less than a microliter in a device with

2    a 1.25 micoliter sample chamber, he would have to perform a complicated finite element analysis.

3    (Bard Depo. at 312:19-313:19, Jorjani Decl., Exh. 41.)   Dr. Bard has testified that such a calculation

4    is within the capability of one of ordinary skill in the art.  (Bard Decl., ¶ 32.)  In any event, the test

5    for enablement is whether one of ordinary skill in the art could practice the full scope of the claims

6    without undue experimentation, not whether one of ordinary skill of the art could easily assess

7    whether a given co-planar amperometric device has a measurement zone satisfying the claims.

8          Because there is a triable issue of fact as to whether the '745 patent is enabled, summary

9    judgment of invalidity is not appropriate on this ground.

10         **G.     Reconsideration of the construction of the "background signal" limitation.**

11          For reasons similar to Abbott's request to reconsider the "reference counterelectrode"

12   limitation, the Court declines Abbott's request to reconsider its construction of the "background

13   signal" limitation.  The Court based its current construction on intrinsic evidence, and the disfavored

14   extrinsic evidence submitted by Abbott is not a sufficient basis to alter the construction.  In its April

15   27, 2007 claim construction order, the Court based its construction largely on the premise that, given

16   the specific content of the '745 specification, this claim limitation was intended as a performance

17   characteristic that is measured by the formulas described in the specification.  Although Abbott

18   submits deposition testimony addressing how the concept of "background signal" is generally

19   understood by numerous Defendant witnesses (*see* evidence cited at page 24 of Abbott's

20   Opposition), Abbott has not persuaded the Court that such evidence should cause the Court to depart

21   from the specific construction suggested by the discussion of this claim limitation in the '745

22   specification.[42]

23   ///

24   ///

25   ///

26   ///

27

28        [42] Abbott has also not established that these witnesses were using the term "background signal" consistent with how one skilled in the art would have used the term at the time the '745 application was filed.

United States District Court
For the Northern District of California

**United States District Court**
For the Northern District of California

1

**CONCLUSION**

2      For the foregoing reasons, the Court rules as follows:

3      (1)     The Court **GRANTS IN PART AND DENIES IN PART** Bayer's motion for

4              summary judgment of noninfringement concerning the '551 patent.  Summary

5              judgment of no literal infringement is appropriate as to Bayer's Microfill and

6              Autodisc strips with respect to all claims of the '551 patent asserted against Bayer

7              (claims 1-4).  However, the Court denies summary judgment with respect to

8              infringement of the '551 patent by these strips under the doctrine of equivalents.

9      (2)     The Court **DENIES** Roche's motion for partial summary judgment of

10             noninfringement concerning the '745 patent.

11     (3)     The Court **GRANTS IN PART AND DENIES IN PART** BD/Nova's motion for

12             summary judgment of noninfringement.  Summary judgment of noninfringement is

13             appropriate as to the BD test strips with respect to all claims of the '164 patent

14             asserted against BD/Nova (claims 16, 20, 22, 23, 26, 27, 34, 36-38 and 40) and all

15             claims of the '745 patent asserted against BD/Nova (claims 1, 3-5, 8, 11, 21-23, 26-

16             30, 34, 37 and 38).  Summary judgment of no literal infringement is also appropriate

17             as with respect to all claims of the '551 patent asserted against BD/Nova (claims 1-4).

18             However, the Court denies summary judgment with respect to infringement of the

19             '551 patent by the BD test strip under the doctrine of equivalents.

20     (4)     The Court **DENIES** BD/Nova's motion for summary judgment of invalidity

21             concerning the '890 patent.

22     (5)     The Court **GRANTS IN PART AND DENIES IN PART** Defendants' motion for

23             summary judgment of invalidity concerning the '745 patent.  The Court finds claims

24             1-5, 8, 21-23, 28, 31 & 34 of the '745 patent to be anticipated and therefore invalid.

25             In all other respects, the Court denies this motion.

26     **IT IS SO ORDERED.**

27     Dated: April 3, 2008                                    _____

                                                             MARTIN J. JENKINS
28                                                           UNITED STATES DISTRICT JUDGE